[No. 15567-2-II.    Division Two.    July 5, 1994.]

JOHN PHILLIPS, ET AL, *Appellants,* v. KAISER
ALUMINUM & CHEMICAL CORPORATION, ET AL,
*Respondents.*

*Philip H. DeTurk,* for appellants.
*Joanne Henry* and *Vandeberg & Johnson,* for respondents.

MORGAN, C.J. — John Phillips sued Kaiser Aluminum & Chemical Corporation, alleging that Kaiser failed to provide a safe workplace. Part of his claim was dismissed by an order granting partial summary judgment, and part was dismissed following a jury verdict for the defense. Because the appeal deals primarily with the order granting partial

summary judgment, we view the facts in the light most favorable to the Plaintiff.

At the times material here, Kaiser owned and operated an aluminum reduction plant in Tacoma. The plant included an unused production building outfitted with several hundred thousand pounds of aluminum "bus". Formerly, the bus had been used to transmit electricity to the plant's smelting pots. The bus was forged in the shape of planks 22 inches across and $3^1/2$ inches thick. A 10-foot segment of a plank weighed about 1,000 pounds.

Kaiser wanted to remove and sell the bus. Thus, it entered into a contract with D.L. Anderson Concrete Co., Inc. (Anderson). The contract called for Anderson to cut the bus into 10-foot lengths, remove it from the building, band it, and load it onto pallets for shipping. It also called for Anderson to provide "labor, tools, equipment and supervision".[1]

Kaiser rather than Anderson determined that the bus would be cut with chainsaws. According to Kaiser, "it is common and usual practice to cut aluminum bus with chain saws, and it has been done at the Kaiser plant for . . . about 30 years."[2]

Kaiser rather than Anderson purchased three new chainsaws and supplied them to Anderson's workers. Kaiser also furnished dust masks for the workers and a large fan for ventilation.

Kaiser hired Al Wilhelm, temporarily but full time, to oversee the job. His duties "were to oversee the progress of the work, to assist Anderson and his men in planning and accomplishing the best method to remove the aluminum, and to watch out for safety".[3] He was at the job site "full-time each working day, and usually met with the Anderson crew at the start of each work day to confirm where work

---

[1]Resp't's Clerk's Papers, at 8.

[2]Supp. Clerk's Papers, at 6.

[3]Supp. Clerk's Papers, at 2. Another Kaiser employee, Richard Cable, similarly described Wilhelm's duties. He said Wilhelm was "to generally oversee the progress of the job to make sure that it was on schedule and that the aluminum was cut as required, and to see to safety." Resp't's Clerk's Papers, at 3-4.

was to begin . . . and to talk about any safety issues that came up or changes in plans for the work".[4]

Kaiser assigned Richard Cable, one of its permanent full-time employees, to act as contract administrator. Cable "had overall responsibility on behalf of Kaiser in administering this contract".[5] He "visited the work at least once a day to make sure that the job was progressing satisfactorily and that the aluminum was cut into the proper sizes and weights".[6] If he saw a safety problem during a visit, he "would bring it to the attention of the worker, the foreman or Mr. Wilhelm, as seemed appropriate under the circumstances".[7]

Anderson's crew "consisted of Keith Roberts, the foreman who also ran a forklift, Dave Wilbur, a laborer who also ran the crane, and two other laborers, one of whom was John Phillips. . .".[8] Dave Anderson, the owner, "put in approximately two hours per day on the job, coming in early in the morning, . . . and late in the afternoon, primarily to see to the tools".[9]

Generally, Wilhelm dealt with Roberts on job-related matters.[10] However, "Roberts became ill on about February 10, 1989, and was not there at all during the week of the accident."[11] Cable and Wilhelm were not concerned about the lack of a foreman because, according to Wilhelm, "this was mainly routine work and not particularly dangerous if the workers were careful."[12]

---

[4]Supp. Clerk's Papers, at 2-3.

[5]Resp't's Clerk's Papers, at 4.

[6]Resp't's Clerk's Papers, at 4.

[7]Resp't's Clerk's Papers, at 4.

[8]Supp. Clerk's Papers, at 2.

[9]Supp. Clerk's Papers, at 2.

[10]According to Roberts, "Mr. Wilhelm was running the job. He would advise me that certain workers weren't performing properly and probably should be sacked, or would complain about the level of production and insist that I get the workmen to be more productive." Appellant's Clerk's Papers, at 85-86.

[11]Supp. Clerk's Papers, at 3.

[12]Supp. Clerk's Papers, at 6.

Phillips began work on January 25, 1989. His job was to cut the bus with a chainsaw, a process he described as "[j]ust like cutting logs".[13] He had never cut aluminum before. He attended one safety meeting, but "there was no discussion regarding how to operate a chain saw in order to cut aluminum or whether or not the bus lines might become unstable under certain conditions."[14] In Wilhelm's opinion, Phillips was "a hard and apparently responsible worker" who was "very good in using his chain saw".[15]

Phillips was "under the impression that the guys from Kaiser . . . were our overseers".[16] Wilhelm was at the jobsite all day, and he told Anderson's employees to stop if they were cutting in the wrong spot. Both Cable and Wilhelm marked how the bus was to be cut, and from time to time one of them would intervene when he thought unsafe methods were being used.

The process of cutting the bus with chainsaws produced smoke and fumes. On one occasion, ventilation was so poor that the entire crew had to leave the building. Roberts testified that he was affected even though he wore a respirator and was not doing the actual cutting. Phillips complained to both Anderson and Cable, and the workers sought better ventilation by removing the plywood that had been used to board up the building's windows.

The parties differ over what occurred during the morning of February 17, 1989. Wilhelm states:

> On the morning of February 17, 1989, I do not recall seeing Mr. Anderson. Work was to start at 7:00 a.m., and the three workmen, Phillips, Wilbur and Dan Davies, were there with their tools when I arrived. We had a short meeting regarding the fact that the work was progressing to the far south end of the basement, where we could have a problem with the last piece of bus on the concrete pillars being cut off from its support and becoming unstable. I told them that if we cut past the

[13]Appellant's Clerk's Papers, at 13.

[14]Appellant's Clerk's Papers, at 94.

[15]Supp. Clerk's Papers, at 5.

[16]Appellant's Clerk's Papers, at 24.

"radius" by the last long piece, the bus might fall down, and that we would have to do something else with that last free-standing piece. Wilbur, who usually ran the crane, suggested that it be pulled out with the crane, and we decided to do that.

After the meeting, Phillips went to the basement area and began to cut. The other two workers were in the upper part of the building . . . . I went down to where plaintiff was working two or three times during the morning. He was having no problems, and there was no undue amount of smoke or fumes present. . . .

I went down to where plaintiff was working immediately before lunch on the day of the accident. He was cutting very near the radius, where we had decided to stop, and as he cut, I saw the bus move. At that point, Phillips stopped cutting, perhaps because his chain broke or perhaps because he saw the bus move also. I told him then: "I saw that bus move. Don't cut here anymore. We'll have to do something else with it after lunch." . . . Phillips did not respond to what I told him, and right at that time, one of the other workmen called down that it was time for lunch, and Phillips left.

Supp. Clerk's Papers, at 3-4.

Phillips does not deny there was a meeting in the morning, or that Wilhelm came into the basement just before lunch. He does deny that he was told not to saw all the way through the bus, that the bus might fall down, or that the bus would be moved with the crane.

When Phillips finished lunch, he resumed cutting the piece of bus that he had been cutting before lunch. According to his testimony, he had an inch or so yet to cut when he became dizzy and faint from the fumes. He "just let go of the saw, turned, took a big step",[17] and fell unconscious. While he was unconscious, apparently, the bus dropped on his ankle and severely injured it. The next thing he remembers is waking up on the floor and yelling for help.

Phillips sued Kaiser in June 1990. In his complaint, he alleged Kaiser was negligent in (1) "[f]ailing to provide a safe place within which to work"; (2) "[f]ailing to provide the proper ventilation in the area where the accident took place"; (3) "[f]ailing to provide the proper equipment for the employee of an independent contractor to use"; (4) "[c]onducting an inherently dangerous condition in an improper manner"; (5)

[17]Appellant's Clerk's Papers, at 17.

"[a]llowing a non delegable duty to be assumed by the plaintiff"; (6) "[f]ailing to provide the necessary supervision regarding the type of work to be performed at a given time"; and (7) "[f]ailing to provide the necessary assistance to enable the workman, once injured, to extricate himself from the present condition".[18]

Kaiser moved for summary judgment on grounds that it owed no duty that had been breached. Phillips argued

> that the Kaiser Aluminum Company did not supply him a safe place in which to work and that it violated the standard duty that this company had to him as an employee of a subcontractor and furthermore, specifically violated certain WISHA requirements as set forth in the WAC. In particular, Phillips maintains that he was improperly instructed regarding safety, that he was inadequately supervised especially at the time he was injured, that there was a failure of proper ventilation, that he was not supplied with an adequate mask for protection against fumes, that the equipment he was given with which to do the cutting was inadequate in that the defendant Kaiser could have used a more sophisticated and not much more expensive type of saw or used scarfing which is a type of cutting without any saw whatsoever. Furthermore, it is the plaintiff's contention that had a very inexpensive type of scaffolding been placed under the busing, it would not have crashed to the floor . . ..[19]

The trial court made several rulings. First, it held that Kaiser owed Phillips a duty in its role as landowner, but that there was no evidence Kaiser had breached that duty. Second, it held that Kaiser owed Phillips a common law duty of care, but that this duty required no more than compliance with specific Washington Industrial Safety and Health Act of 1973 (WISHA) regulations;[20] based on a lack of specific WISHA regulations, it precluded trial on Phillips's allegations "that defendant should have selected some other tool or method to perform the work, that scaffolding or stag-

---

[18]Appellant's Clerk's Papers, at 2-3.

[19]Resp't's Clerk's Papers, at 45-46.

[20]The court said:

"[The d]efendant owed plaintiff a common law duty to avoid causing him injury by defendant's own affirmative negligence. This duty does not . . . include a duty to supervise the work or take safety precautions which are not required by specific safety regulations." Appellant's Clerk's Papers, at 101.

ing should have been placed under the aluminum bus prior to cutting, and that defendant Kaiser was required to train plaintiff in the specific work he was performing".[21] Third, it held that Kaiser had a duty to comply with specific WISHA regulations, but not general ones, and that the only specific regulations as to which Phillips had raised a genuine issue of fact were those pertaining to "mechanical ventilation and/or personal protective devices".[22]

In the end, the court allowed trial on only one issue — whether Kaiser had violated specific regulations pertaining to "mechanical ventilation and/or personal protective devices". On that issue, the jury returned a defense verdict, and Phillips then filed this appeal.

■ We begin by analyzing Kaiser's liability as a landowner. When a plaintiff is an invitee, a landowner's duty is "to keep the premises under his control reasonably safe and to warn of dangers which are not obvious . . . but are known to or discoverable by the owner in the exercise of reasonable care". *Lamborn v. Phillips Pac. Chem. Co.*, 89 Wn.2d 701, 708, 575 P.2d 215 (1978); *Epperly v. Seattle*, 65 Wn.2d 777, 786, 399 P.2d 591 (1965); *Winfrey v. Rocket Research Co.*, 58 Wn. App. 722, 725, 794 P.2d 1300, *review denied*, 115 Wn.2d 1030 (1990). This duty, however, does not make the landowner liable for the negligent acts or omissions of an independent contractor, *Lamborn*, 89 Wn.2d at 708; in other words, it does not make the landowner liable where the work of an independent contractor "is of an unsafe nature or the defects are due to the imperfect and negligent work of the contractor himself". *Epperly*, 65 Wn.2d at 786 (quoting 2 Thomas G. Shearman & Amasa A. Redfield, *Negligence* § 279, at 689 (rev. ed. 1941)).

In this case, Kaiser was a landowner and Phillips was an invitee. *Epperly*, 65 Wn.2d at 786; *Bozung v. Condominium Builders, Inc.*, 42 Wn. App. 442, 447, 711 P.2d 1090 (1985). Thus, Kaiser owed Phillips the duty just described. How-

---

[21]Appellant's Clerk's Papers, at 100.

[22]Appellant's Clerk's Papers, at 99.

ever, Phillips presented no evidence showing a defective or dangerous condition in the premises, as opposed to work being performed on the premises in a negligent or dangerous way. We hold that the trial court did not err when it ruled, as a matter of law, that Kaiser was not liable in its role as a landowner.

We next analyze Kaiser's liability as principal/employer of D.L. Anderson Concrete Co., Inc. We focus first on the common law, and second on WISHA.

Liability under the common law can be subdivided into direct and vicarious liability. Direct liability is liability for breach of one's own duty of care, while vicarious liability, sometimes called imputed negligence, is liability for breach of another's duty of care. *Van Hook v. Anderson*, 64 Wn. App. 353, 363, 824 P.2d 509 (1992); *see Peck v. Siau*, 65 Wn. App. 285, 287-88, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992).

■ Vicarious liability can be dealt with quickly. Phillips does not dispute that Kaiser's and Anderson's relationship was one of principal and independent contractor.[23] Generally, a principal is not vicariously liable for the acts of an independent contractor. *Epperly*, 65 Wn.2d at 785. This is true even when a principal hires an independent contractor to perform inherently dangerous work, if the injured plaintiff is an employee of the independent contractor. *Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 277, 635 P.2d 426 (1981). As a result, Kaiser is not vicariously liable for the negligent acts or omissions of Anderson, if any.

---

[23]In passing, we observe that whether a relationship is one of principal and independent contractor is a question different from whether the principal owes a common law duty of care. The concept of control, however, affects both questions. Control can cause a relationship to involve master and servant rather than principal and independent contractor, thus creating the possibility of vicarious liability. *Fardig v. Reynolds*, 55 Wn.2d 540, 544, 348 P.2d 661 (1960) ("[T]he ultimate test . . . in determining whether a relationship is that of employer and employee or that of principal and independent contractor is . . . whether . . . the employer retained the right . . . to control the manner of doing the work and the means by which the result was to be accomplished."); *see also* Restatement (Second) of Agency §§ 2, 220, 250-251 (1958). Additionally or alternatively, control can generate a common duty of ordinary care on the part of a principal, thus creating the possibility of direct liability. The common law duty is discussed later in this opinion.

■ Direct liability is more difficult. The principal/ employer of an independent contractor owes a duty of care to an employee of the contractor if it retains a right to control the contractor's work. *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 330, 582 P.2d 500 (1978); *Kennedy v. Sea-Land Serv., Inc.*, 62 Wn. App. 839, 851, 816 P.2d 75 (1991); *Bozung*, 42 Wn. App. at 446; Restatement (Second) of Torts § 414 (1965); W. Page Keeton et al., *Prosser and Keeton on Torts* § 71, at 510 (5th ed. 1984). Whether a right to control has been retained depends on the parties' contract, the parties' conduct, and other relevant factors. One such factor is a principal/employer's interference in the work of the independent contractor; however, a *right* to control can exist even in the absence of that factor. *See Kelley*, 90 Wn.2d at 330-31 ("The test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control."); *Kennedy*, 62 Wn. App. at 851 (same); *Bozung*, 42 Wn. App. at 446 (same). It is not enough that the principal/employer have reserved "a right to oversee compliance with contract provisions"; rather, the principal/ employer must have reserved a right "to so involve oneself in the *performance* of the work as to undertake responsibility for the safety of the independent contractor's employees". *Hennig v. Crosby Group, Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991); Restatement (Second) of Torts § 414, cmt. c (1965).[24]

■ When a right to control is retained, it must be exercised with reasonable care. *Kelley*, 90 Wn.2d at 330; Restatement (Second) of Torts § 414 (1965). Thus, a principal/ employer has "a duty to take reasonable care to provide a

---

[24]Comment c provides:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

safe place of work under the common law of tort". *Kelley*, 90 Wn.2d at 330; *see also Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 130, 803 P.2d 4 ("common law duty to exercise ordinary care for [plaintiff's] safety"), *review denied*, 116 Wn.2d 1034 (1991); *Bozung*, 42 Wn. App. at 446 ("employer is liable for injuries to the employees of the independent contractor caused by the employer's failure to exercise that control with reasonable care"); Restatement (Second) of Torts § 414 (1965). This duty, however, exists only "within the scope" of the principal/employer's retained control. *Kelley*, 90 Wn.2d at 330; *Kennedy*, 62 Wn. App. at 851; *Weinert v. Bronco Nat'l Co.*, 58 Wn. App. 692, 697, 795 P.2d 1167 (1990). The duty is summarized in Restatement (Second) of Torts § 414:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965). And its application to cases of the present kind is discussed in comment b to § 414:

> The rule stated in [§ 414] is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. . . .

Restatement (Second) of Torts § 414, cmt. b.

Kaiser makes two arguments designed to show that a common law duty did not arise in this case. First, it argues that the common law duty was eliminated or narrowed by *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990). As a result, it says, an employer's only duty to the employee of an independent contractor is to comply with specific

WISHA regulations. Kaiser bases these assertions on a single sentence from *Stute*: "The employer's duty only extends to employees of independent contractors when a party asserts that the employer did not follow particular WISHA regulations." *Stute,* 114 Wn.2d at 457.

We reject this argument. In the sentence Kaiser relies on, the *Stute* court was saying that an employer did not owe a general duty because of WISHA; it was not saying that an employer did or did not owe a common law duty of care. Moreover, it appears to us that the *Stute* court was intending to expand, not narrow, whatever duty an employer already had. Thus, it did not eliminate or narrow the common law duty described in *Kelley,* and Restatement § 414. *See also Hennig,* 116 Wn.2d at 134 (common law duty of care recognized and discussed a year after *Stute*).

■ Second, Kaiser argues that the common law duty can be breached only by acts of "affirmative negligence".[25] Because we know of no distinction between "affirmative" and "negative" negligence, we assume the argument is that the common law duty of care must be breached by commission rather than omission. We reject this argument as contrary to reason and the cases. *E.g., Kelley* (common law duty breached by omitting to provide safety net under worker); *Greenleaf v. Puget Sound Bridge & Dredging Co.,* 58 Wn.2d 647, 364 P.2d 796 (1961) (common law duty breached by omitting to provide proper lighting); *Doss,* 60 Wn. App. at 130 (summary judgment improper because common law duty might have been breached by omitting to provide safety net above worker).

Kaiser owed a common law duty of care in this case. It was in charge of the way in which the work was done; thus, it ordered that the bus be cut with chainsaws, and it could have ordered that the bus be supported by scaffolding as it was being cut. Wilhelm conducted meetings each morning to determine how the work was progressing, and to address safety issues. Wilhelm's and Cable's duties included safety, and they routinely gave direction to the workers on safety-

---

[25]Br. of Resp't, at 14.

related matters. On the morning of the accident, Wilhelm determined that the workers should not cut past the radius of certain pieces of bus, and that those pieces would be "pulled out with the crane". At the time of the accident, Roberts was absent, and it appears that Wilhelm and Cable were in charge of the job. Cumulated, these facts show a right to control safety-related matters,[26] and an outgrowth of that right was a common law duty of care.

Kaiser argues that even if it had a common law duty of care, Phillips failed to produce evidence of breach. However, we disagree. The record supports inferences that Kaiser failed to exercise such care, and that its failure was a proximate cause of the accident. The record also supports contrary inferences that Kaiser exercised such care, and that its failure was not a proximate cause of the accident. Thus, the record shows genuine issues of fact, and the trial court erred in granting summary judgment as it did.

Kaiser argues that even if the trial court erred, it did not err in such a way as to warrant reversal and new trial. First, Kaiser says that any error in granting summary judgment was rendered harmless because Phillips's claim of negligent training and supervision was actually submitted to the jury at the trial. We disagree. Although training and supervision were mentioned tangentially in the trial, Phillips did not have a full opportunity to litigate those matters.[27]

■ Second, Kaiser says that Phillips waived his claim of error because at trial he did not propose a jury instruction describing the common law duty of care. Again, however, we disagree. The trial court ruled before trial that the jury could consider only WISHA violations, and Phillips was not

---

[26]Given the circumstances present here, we deem such matters to include, to the extent necessary for safety, training, supervision, ventilation, and scaffolding. We omit the selection of equipment because there is no evidence that Phillips's chainsaw was defective, or, if it was, that the defect was a proximate cause of the accident.

[27]In part, this is true because the court's jury instructions, especially including instruction 13, did not adequately describe Kaiser's common law duty of care.

required to propose an instruction that he knew would not be given.

Kaiser also argues that even if a new trial is required, it should not include the specific WISHA regulations that were litigated at the first trial, *i.e.*, those pertaining to ventilation. Our view, however, is that Phillips alleges a single cause of action for negligence, and that a single cause of action should generally be adjudicated in one proceeding. *Cf. Doerflinger v. New York Life Ins. Co.*, 88 Wn.2d 878, 881-82, 567 P.2d 230 (1977); *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 4 Wn. App. 49, 50-51, 480 P.2d 226 (1971). We hold that Phillips is entitled to a new trial on his entire cause of action for negligence.

Finally, we turn to matters that may recur at the new trial. Phillips argues that the trial court improperly excluded more than 20 parts of various WISHA regulations. He also contends the trial court erred by refusing to give various proposed jury instructions, and that certain manuals were admissible in evidence. Kaiser argues that the trial court improperly allowed the jury to consider the issue of Phillips's future earnings.

■ WISHA imposes on every employer[28] a general duty to protect its own employees from recognized hazards not covered by specific safety regulations. *Stute*, 114 Wn.2d at 457, 463; *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 153, 750 P.2d 1257, 756 P.2d 142 (1988); *Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 672-73, 709 P.2d 774 (1985); RCW 49.17.060(1). It also imposes on at least some employers a specific duty to comply with specific WISHA regulations, which duty extends not just to the employer's own

---

[28]The term "employer" is defined in RCW 49.17.020(3), which provides:

"(3) The term 'employer' means any person, firm, corporation, partnership, business trust, legal representative, or other business entity which engages in any business, industry, profession, or activity in this state and employs one or more employees or who contracts with one or more persons, the essence of which is the personal labor of such person or persons and includes the state, counties, cities, and all municipal corporations, public corporations, political subdivisions of the state, and charitable organizations: PROVIDED, That any person, partnership, or business entity not having employees, and who is covered by the industrial insurance act shall be considered both an employer and an employee."

employees, but to the employees of independent contractors as well. *Stute*, 114 Wn.2d at 457; *Adkins*, 110 Wn.2d at 153; *Goucher*, 104 Wn.2d at 672-73; RCW 49.17.060(2). The specific duty is owed, at least, by general contractors and by jobsite owner/developers with supervisory authority. *Kennedy*, 62 Wn. App. at 851; *Doss*, 60 Wn. App. at 130.

A necessary corollary of these precepts is that a trial court must consider whether a given WISHA regulation reflects an employer's general duty or an employer's special duty. If a case involves a plaintiff who was not the defendant/employer's employee, and a regulation reflects only a defendant/employer's general duty, the jury should not be told of it.[29] But if the regulation reflects a defendant/employer's special duty, the jury should be told of it, *see* RCW 5.40.050,[30] provided of course that its proponent has produced evidence from which the jury could reasonably infer the facts that must be found in order to apply it. *See State v. King*, 92 Wn.2d 541, 547, 599 P.2d 522 (1979).

As already noted, Phillips wanted to rely on a plethora of WISHA regulations. By means of its motion for summary judgment, Kaiser objected to some on grounds that they reflected an employer's general duty, rather than an employer's specific duty. It objected to others because they did not apply to the situation at hand, or because they were not supported by evidence from which a jury could find violation and causation. The trial court excluded a variety of regulations on each of these grounds.

After reviewing each regulation that was (a) presented to the trial court, (b) ruled on by the trial court and (c) argued

---

[29]For example, WAC 296-155-040(1) is a verbatim reiteration of the general duty that an employer does *not* owe to the employees of other employers. *See Stute; Adkins; Goucher.* If put before the jury in a case in which the plaintiff was not the defendant's employee, it would in effect impose a duty which *Stute, Adkins,* and *Goucher* say the defendant does not owe.

[30]RCW 5.40.050 provides in pertinent part:

"A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence . . .".

in Phillips's brief on appeal, we find no error.[31] The trial court excluded only those that reflected the general duty, those that were inapplicable under the circumstances of this case, and those unsupported by evidence of violation or causation.

■ Moving to Phillips's proposed jury instructions, we again find no error. Phillips's proposed instructions 45, 46 and 47 were incorrect statements of the law. The rest that were excluded were irrelevant, not supported by the evidence, incorrect, incomplete, unnecessary because covered elsewhere, or unnecessary because within the common knowledge of ordinary jurors.

We decline to review Phillips's claim regarding the manuals. Nothing in the record on appeal shows that the manuals were ever offered in the trial court, or that the trial court ever made a ruling.

Kaiser says the trial court erred by instructing the jury "that it could consider as damages proximately caused by this accident earnings to be lost in the future".[32] We see no error.

The parties' remaining arguments lack merit or need not be reached.

Reversed and remanded for new trial.

ALEXANDER and HOUGHTON, JJ., concur.

---

[31]We do not review all the regulations that have been mentioned in the course of this case. Some were not presented to the trial court, others were not ruled on by the trial court, and still others are not argued on appeal.

[32]Br. of Resp't, at 40.