277 P.3d 34 (2012)
Ignacio CANO-GARCIA and Maribel Cano, husband and wife, and the marital community comprised thereof, Appellant,
v.
KING COUNTY, Washington, a local government entity in the state of Washington, and Jacobs Civil Incorporated, a Missouri Corporation, Respondents.
No. 41765-1-II.
Court of Appeals of Washington, Division 2.
May 8, 2012.
*38 Derek K. Moore, Bishop Law Offices PS, Raymond Everett Sean Bishop, Bishop Law Offices PS, Normandy Park, WA, for Appellant.
Geoffrey M. Grindeland, Mills Meyers Swartling, Stanton Phillip Beck, Ryan P. McBride, Andrew J. Gabel, Attorney at Law, Lane Powell PC, Seattle, WA, for Respondents.
PENOYAR, C.J.
¶ 1 Ignacio Cano-Garcia and Maribel Cano appeal the summary judgment order dismissing their claims based on Cano-Garcia's[1] workplace injury against King County and Jacobs Civil, Inc. (Jacobs). Cano-Garcia was injured while working for the general contractor on a project King County owned and Jacobs monitored. Cano-Garcia argues that he could establish facts at trial showing that King County and Jacobs each had a duty to protect him from injury. Considering the relevant contracts, the jobsite activities, and King County's ownership of the land, we conclude that neither King County nor Jacobs is liable to Cano-Garcia for his injuries. We affirm.

FACTS
¶ 2 King County retained Kenny/Shea/Traylor ("KST") to be the general contractor on one phase of a multi-billion dollar regional wastewater treatment facility construction project called "Brightwater." Because KST was one of approximately eight general contractors working on different aspects of the project, King County hired Jacobs, an engineering and construction management firm, to monitor several of the general contractors and to make sure each one complied with the terms of their contracts with King County.
¶ 3 On December 5, 2008, Cano-Garcia suffered injuries while working for KST on the Brightwater project. That day, KST transferred Cano-Garcia from another activity to the task of working on the concrete pour, which required wading in a mixture of concrete and water. KST equipped Cano-Garcia with 15-inch-high boots and rain pants. KST employee Joe Romo supervised Cano-Garcia at the concrete pour and gave him instructions. Cano-Garcia, along with his coworker Mark Pointer, asked Romo for hip waders. Romo told Cano-Garcia and Pointer that he did not have a key to the room where the waders were stored. Cano-Garcia *39 then used duct tape to tape his pants to his boots. Romo assured Cano-Garcia that the height of the concrete would be between 3 inches to a little less than 15 inches. Romo then left the area.
¶ 4 Cano-Garcia began working on the concrete pour around noon. He worked until approximately 5:30 P.M. The depth of the concrete mixture unexpectedly exceeded the height of his boots. At some point, the duct tape system failed and the concrete mixture entered his boots, although he did not realize it until the end of his shift when he removed his clothes. When Cano-Garcia arrived at home, he called KST's safety manager. The next day, when Cano-Garcia arrived at the jobsite, a KST employee took Cano-Garcia to seek medical attention. Cano-Garcia eventually required skin graft surgery.
¶ 5 Cano-Garcia's employer, KST, is immune from suit under Washington's Industrial Insurance Act, RCW 51.04.010 et seq.[2], [3] Cano-Garcia sued both King County and Jacobs, alleging that King County and Jacobs performed the functions of a general contractor and retained the right to control the manner in which KST's employees completed their work and, therefore, King County and/or Jacobs were liable for violating the Washington Industrial Safety and Health Act of 1973, chapter 49.17 RCW (WISHA), regulations and for common law negligence. Cano-Garcia sought past and future medical expenses, wage loss, general damages, and other expenses. Maribel Cano alleged loss of spousal consortium, emotional distress, general damages, and other expenses.
¶ 6 King County and Jacobs each moved for summary judgment. The trial court entered orders granting King County's and Jacobs's summary judgment and dismissing all claims. Cano-Garcia appeals.

ANALYSIS

I. STANDARD OF REVIEW
¶ 7 In an action for negligence, a plaintiff must prove the existence of a duty, breach of that duty, resulting injury, and proximate causation. Alhadeff v. Meridian on Bainbridge Island, LLC, 167 Wash.2d 601, 618, 220 P.3d 1214 (2009). Whether a duty exists in the negligence context is a question of law that we review de novo. Aba Sheikh v. Choe, 156 Wash.2d 441, 448, 128 P.3d 574 (2006).
¶ 8 On appeal of a summary judgment order, we review the decision de novo, performing the same inquiry as the trial court. Bostain v. Food Express, Inc., 159 Wash.2d 700, 708, 153 P.3d 846 (2007); Jones v. Allstate Ins. Co., 146 Wash.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We consider all facts in the light most favorable to the nonmoving party. Jones, 146 Wash.2d at 300, 45 P.3d 1068. Summary judgment is proper only if reasonable persons could reach but one conclusion from the evidence presented. Bostain, 159 Wash.2d at 708, 153 P.3d 846. The moving party bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). The nonmoving party cannot merely claim contrary facts and may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on affidavits considered at face value. Meyer v. Univ. of Wash., 105 Wash.2d 847, 852, 719 P.2d 98 (1986).

*40 II. STATUTORY DUTY
¶ 9 Cano-Garcia argues that King County and Jacobs owed him a statutory duty of care under WISHA. Appellant's Br. at 26. We disagree.

A. Cano-Garcia Must Show that King County and/or Jacobs Retained Sufficient Control to Show Liability for Statutory Violations
¶ 10 RCW 49.17.060(2)[4] imposes a nondelegable duty on all general contractors to ensure compliance with WISHA regulations. Kamla v. Space Needle Corp., 147 Wash.2d 114, 122, 52 P.3d 472 (2002) (citing Stute v. P.B.M.C., Inc., 114 Wash.2d 454, 464, 788 P.2d 545 (1990)). The Supreme Court in Stute imposed primary responsibility for compliance with WISHA regulations on the general contractor because it is an "employer" under WISHA and because its "innate supervisory authority constitutes sufficient control over the workplace." Stute, 114 Wash.2d at 457-58, 464, 788 P.2d 545.
¶ 11 Courts have extended the rule in Stute to jobsite owners who maintain sufficient control over the workplace or the work to justify imposing statutory liability. See, e.g., Kamla, 147 Wash.2d 114, 52 P.3d 472; Afoa v. Port of Seattle, 160 Wash.App. 234, 247 P.3d 482, review granted, 171 Wash.2d 1031, 257 P.3d 664 (2011); Neil v. NWCC Inves., LLC, 155 Wash.App. 119, 128, 229 P.3d 837, review denied, 169 Wash.2d 1018, 238 P.3d 502 (2010); Doss v. ITT Rayonier, Inc., 60 Wash.App. 125, 803 P.2d 4 (1991); Weinert v. Bronco Nat'l Co., 58 Wash.App. 692, 795 P.2d 1167 (1990). Our review of this case law shows that liability flows to those who are in a position to control the actual implementation of safety standards in the workplace.
¶ 12 In Weinert,[5] the court held that the duty announced in Stute applied not only to general contractors, but also to jobsite owners who retain control or supervisory authority over the performance of a subcontractor's work. 58 Wash.App. at 696, 795 P.2d 1167. Similarly, in Doss, an employee of an independent contractor hired by ITT Rayonier was killed in an accident at the jobsite. 60 Wash.App. at 126, 803 P.2d 4. The estate alleged that ITT Rayonier violated a specific WISHA provision. Doss, 60 Wash.App. at 126-27, 803 P.2d 4. The court noted ITT Rayonier was a jobsite owner and not a general contractor but, under the facts there, found "no significant difference ... between an owner-independent contractor relationship and a general contractor-subcontractor relationship." Doss, 60 Wash.App. at 127 n. 2, 803 P.2d 4.
¶ 13 Most recently, in Afoa, another division of this court held that genuine material factual issues existed as to whether the Port of Seattle retained liability-creating control over an independent contractor that provided aircraft ground handling services. 160 Wash.App. at 236-37, 247 P.3d 482. Afoa was injured when a vehicle he was operating failed and he collided with a broken piece of equipment on the tarmac at Seattle-Tacoma International Airport. Afoa, 160 Wash.App. at 237, 247 P.3d 482. The Afoa court was presented with evidence showing that the Port retained sufficient control to create a duty on the Port to make the work area safe. Afoa, 160 Wash.App. at 244, 247 P.3d 482. The Port's contrary evidence, at best, created a material factual dispute and did not entitle it to summary judgment. Afoa, 160 Wash.App. at 244, 247 P.3d 482.
¶ 14 In contrast, the Supreme Court in Kamla held that under the facts of that case, the Space Needle's relationship with an independent contractor who installed a fireworks display did not justify imposing a nondelegable duty to ensure WISHA compliance. *41 Kamla, 147 Wash.2d at 122-24, 52 P.3d 472. Kamla, an employee of the independent contractor, was injured when his safety line snagged on a moving elevator and dragged him through the elevator shaft. Kamla, 147 Wash.2d at 118, 52 P.3d 472. The court reasoned that even though jobsite owners may have the authority to control jobsite work conditions, they may not have knowledge or expertise about WISHA regulations. Kamla, 147 Wash.2d at 124, 52 P.3d 472. Because such jobsite owners cannot instruct contractors on how to work safely, they may rely on their contractors to ensure WISHA compliance. Kamla, 147 Wash.2d at 124-25, 52 P.3d 472. Accordingly, "[i]f a jobsite owner does not retain control over the manner in which an independent contractor completes its work, the jobsite owner does not have a duty under WISHA to `comply with the rules, regulations, and orders promulgated under [chapter 49.17 RCW].'" Kamla, 147 Wash.2d at 125, 52 P.3d 472 (alteration in original) (quoting RCW 49.17.060(2)). For this reason, the Supreme Court held that the Space Needle was not liable to the contractor's employee because it did not retain the right to control the manner in which the contractor and its employees accomplished their work. Kamla, 147 Wash.2d at 125, 52 P.3d 472.
¶ 15 Similarly, in Neil, the court held that the jobsite owner was not liable to the injured employee where the owner only occasionally visited the jobsite, did not supervise the work being performed, did not have any experience or specialized training in construction or workplace safety, and did not provide instructions regarding safety or require certain safety procedures on the worksite. 155 Wash.App. at 128, 229 P.3d 837. The court held that the duty in Stute "does not extend to owners that do not retain the right to control the manner in which the independent contractor and its employees perform their work." Neil, 155 Wash.App. at 127, 229 P.3d 837.
¶ 16 Notably, authority to merely inspect the work and demand contract compliance does not constitute "retained control." Kamla, 147 Wash.2d at 120, 52 P.3d 472 (quoting Hennig v. Crosby Grp., Inc., 116 Wash.2d 131, 134, 802 P.2d 790 (1991)). For example, in Hennig, our Supreme Court held that a contract authorizing the Port of Seattle to inspect an independent contractor's work to ensure contract compliance did not impose liability on the Port. 116 Wash.2d at 134, 802 P.2d 790. Our Supreme Court stated, "`[t]he retention of the right to inspect and supervise to insure the proper completion of the contract does not vitiate the independent contractor relationship.'" Hennig, 116 Wash.2d at 134, 802 P.2d 790 (quoting Epperly v. City of Seattle, 65 Wash.2d 777, 785, 399 P.2d 591 (1965)). Instead, an employer must have retained a right "to so involve oneself in the performance of the work as to undertake responsibility for the safety of the independent contractor's employees." Hennig, 116 Wash.2d at 134, 802 P.2d 790 (emphasis in original).
¶ 17 The Kamla court found the Restatement of Torts instructive on this issue:
"[T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."
Kamla, 147 Wash.2d at 121, 52 P.3d 472 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c. (1965)) (alteration in Kamla); see also Arnold v. Saberhagen Holdings, Inc., 157 Wash.App. 649, 663, 240 P.3d 162 (2010), review denied, 171 Wash.2d 1012, 249 P.3d 1029 (2011) ("The employer does not retain control by controlling the timing or order of work, by retaining the right to order the work stopped, or by inspecting the contractor's work to ensure adequate progress."); Bozung v. Condo. Builders, Inc., 42 Wash.App. 442, 447, 711 P.2d 1090 (1985) ("[G]eneral contractual rights [such] as the *42 right to order the work stopped or to control the order of the work or the right to inspect the progress of the work do not mean that the general contractor controls the method of the subcontractor's work.").
¶ 18 At the same time, evidence of actual control of the independent contractor by the jobsite owner is not necessary; rather, the test is whether the party contracting with the independent contractor retains a right to direct the manner in which the work is performed. Kamla, 147 Wash.2d at 121, 52 P.3d 472. The right to control can exist even where the party does not actually interfere with the independent contractor's work. Phillips v. Kaiser Aluminum & Chem. Corp., 74 Wash.App. 741, 750, 875 P.2d 1228 (1994).
¶ 19 The dispositive question, then, is whether a material question of fact exists as to whether King County and Jacobs retained the right to control the manner in which KST and its employees performed their work such that King County and/or Jacobs were in a position to control the actual implementation of safety standards in the workplace.
¶ 20 In evaluating this question, we must look beyond evidence of inspections, demands of contract compliance, suggestions or recommendations that did not necessarily need to be followed, prescriptions of alterations and deviations, receipt of reports, and authority to stop work or resume work. The determination is fact-based and turns on factors such as whether, always viewing the evidence in a light most favorable to Cano-Garcia, King County and/or Jacobs retained control over the manner in which KST and its employees did their work, see Kamla, 147 Wash.2d at 125, 52 P.3d 472; whether King County and/or Jacobs had "the greater practical opportunity and ability to insure compliance with safety standards," Stute, 114 Wash.2d at 462, 788 P.2d 545 (internal quotations omitted); and whether the King County and/or Jacobs had "innate supervisory authority," Doss, 60 Wash.App. at 128, 803 P.2d 4. See also Afoa, 160 Wash.App. at 247, 247 P.3d 482 (discussing the above factors). Additionally, "[w]hether a right to control has been retained depends on the parties' contract, the parties' conduct, and other relevant factors." Phillips, 74 Wash.App. at 750, 875 P.2d 1228. Finally, evidence of actual control can indicate retained control. See Phillips, 74 Wash.App. at 750, 875 P.2d 1228 ("One such factor is a principal/employer's interference in the work of the independent contractor; however, a right to control can exist even in the absence of that factor.").

B. Neither King County nor Jacobs Retained Control Sufficient to Impose Liability

1. The Contract Between KST and King County
¶ 21 First, we look to the contract language to determine whether King County retained control over the safety of KST employees. King County and Jacobs argue that the contract language makes it clear that KST had complete control over the manner in which it managed and supervised the day-to-day work of KST employees. We agree.
¶ 22 As a preliminary matter, Cano-Garcia argues that the disclaimers and indemnity provisions do not preclude liability because King County cannot disclaim nondelegable duties. We agree that the contract language cannot defeat other evidence that shows retained control. See, e.g., Afoa, 160 Wash.App. at 241, 247 P.3d 482. But we may review the contract language to determine the parties' intent regarding retained control. Afoa, 160 Wash.App. at 241, 247 P.3d 482 ("The issue is whether the Port has a contractual relationship with [Afoa's employer] by which it retained control."); Phillips, 74 Wash.App. at 750, 875 P.2d 1228 ("Whether a right to control has been retained depends on the parties' contract.").
¶ 23 Several contract provisions between King County and KST addressed control of the work and safety, generally ceding authority and responsibility for both to KST. In section 1.09, "Job Site Safety," the contract specified that:
The Contractor shall have the "right to control" and bear the sole responsibility for the job site conditions, and job site safety. The Contractor shall comply with all applicable federal, state, and local safety *43 regulations governing the job site, employees and subcontractors.
Clerk's Papers (CP) at 113 (boldface original). Other sections made similar pronouncements, such as section 3.1, "General Duties;" section 3.19, "Contractor's Overall Responsibility for Protection of Work, Property, and Persons;" and section 3.20, "Protection of Persons." The contract also required that KST "take all reasonable precautions for the safety of all employees" and to comply with OSHA and WISHA. CP at 437. In his deposition, Leon Maday, King County's project representative for the contract with KST, confirmed, however, that King County had the authority to stop work for imminent hazards.
¶ 24 In section 4.6, "Tests, Inspections, and Access to the Work," the contract stated: "The County may, at any reasonable time and at its own cost, conduct inspections and tests as it deems necessary to ensure that the Work is in accordance with the Contract." CP at 161-62. But the contract noted that the inspections did not "[c]onstitute or imply acceptance." CP at 162.
¶ 25 The contract required KST to prepare various safety plans and programs and keep the County apprised of those plans. The County's role in these plans and their implementation was specifically limited: "The County's review of such programs shall not be deemed to constitute approval or acceptance thereof and shall not relieve or diminish the Contractor's sole responsibility for Site safety." CP at 160. The Contract also stated, "It is not the intent of the County to develop, manage, direct, and administer the safety and health programs of contractors or in any way assume the responsibility for the safety and health of their employees." CP at 440.
¶ 26 The contract did provide a role for King County and Jacobs in worksite safety and work inspection. But this role was limited to obtaining and receiving information about KST's work and safety plans and their implementation. And while King County could accept or reject plans and work and could even order that work be stopped for imminent hazards, King County had no authority to tell KST how to perform its obligations under the contracts.
¶ 27 It is apparent that the parties' intent under the contractual language was that KST should have control over the workers' safety. Although the contract language provided for inspections to ensure compliance with the contract and relevant laws and regulations and stop work authority if an imminent threat to safety arose, those powers alone are not enough to constitute retained control. The limited general control Jacobs and King County retained in the contract did not create a duty on their part to inspect Cano-Garcia's protective clothing before he stepped into the concrete pour. Next, we examine whether specific contract provisions Cano-Garcia identified change that result.

2. Submittal Review Process
¶ 28 Cano-Garcia contends that the submittal review process exhibits retained control. We disagree.
¶ 29 The contract between King County and KST required that KST present several "submittals" for acceptance, including "all the technical submittals, all the method statements, [and] all the products they're going to use." CP at 304. Several parties, including Jacobs, reviewed the submittals and made comments if necessary. Jacobs could make recommendations to King County regarding whether the submittals met the state law requirements and otherwise complied with the contract. King County could then choose to accept, ask for a revision, or reject the plan. If King County accepted or made a note, work could proceed. If King County asked for a revision or rejected the submittal, KST could not go forward without submitting a revised submittal.
¶ 30 King County's and Jacobs's employees testified that the purpose of the submittal review process was "simply to check that the contractor's plan includes the requirements of the contract" and to "determine if [the submittal met] contract requirements." CP at 357, 303. Jacobs's safety manager testified that Jacobs reviewed safety plans mainly for the purpose of ensuring the safety of Jacobs's employees while on site but that *44 Jacobs could not tell KST to alter its safety plans.
¶ 31 The submittal review process does not constitute retained control.[6] The process provided King County and Jacobs the opportunity to present comments and require revisions to the means and manner in which KST handled its work, including safety. But neither King County nor Jacobs required a specific manner in which KST worked and ensured safety. The submittal review process merely checked to make sure procedures KST used complied with the contract, including safety regulations, as well as other concerns such as timeliness and cost. The submittal review process alone did not constitute retained control.

3. Safety Incentive Program
¶ 32 Cano-Garcia next argues that the mandatory safety incentive program constituted retained control. We again disagree.
¶ 33 The safety incentive program "specifie[d] a safety awareness program to encourage jobsite safety ... based on certain performance criteria." CP at 219. The program, administered by KST's Site Health and Safety Officer, set a goal "Project Incidence Rate" and tracked "recordable" injuries. CP at 219, 312. The program also involved "Safety Evaluation Reports" (SERs) every six months. During a SER, an evaluating team made up of KST, King County, and Jacobs staff evaluated safety based on "efforts, implementation, effectiveness, and results." CP at 219. The SER team would look for "about 23 category items of all kinds of different things from maintenance to some paperwork to housekeeping to electrical items, fire protection items, all kinds of things like that." CP at 312. KST could earn or lose money based on the results. A corollary "Employee Safety Incentive Program" encouraged employees to practice safety and required discipline of employees who did not report or pressured another employee not to report an accident or injury. CP at 221.
¶ 34 John Critchfield, Jacobs's project manager, testified that the SER process was merely "another way of checking compliance with the contract." CP at 361. We agree. While the evaluating team completed the SERs in detail, including suggestions for improvements on safety, the safety incentive program intended only to encourage and enforce compliance with contract provisions relating to safety. That alone does not constitute retained control.

4. Jacobs's Authority and Inspections
¶ 35 Cano-Garcia next contends that Jacobs's contract with King County and the inspections Jacobs performed on behalf of King County constituted retained control. Jacobs's duties included cost control and estimating, design review, community relations, schedule tracking, and contract and field inspection services.
¶ 36 Subtask 151 of the contract between King County and Jacobs ("Safety Program (Revised)") stated:
The construction contractors have responsibility for site safety per the construction contract specifications.
. . . .
Health and Safety Program: For the Brightwater Conveyance project, the [construction management (CM)] consultant's Safety Manager will provide a written Health and Safety Program that identifies the requirements for construction safety and the roles, responsibilities and authority for safety performance for the CM. The Safety Manager will provide recommendations to the CM and Project Representative regarding review and approval of contractors' *45 safety programs (submittals). The Safety Manager will be responsible to coordinate with all contractor safety officers and safety officials representing emergency response agencies, [OSHA] and [WISHA].
CP at 229 (boldface original). It continued, "The CM's safety expert will make periodic visits to project work sites, attend monthly safety meetings and work with the construction contractors' safety staff to insure [sic] compliance with all safety requirements of the contracts." CP at 235. Jacobs also was required to ensure the safety of its own employees. Also:
The CM's safety expert will respond to safety issues that arise on the project and coordinate emergency response planning with appropriate agencies. The CM will prepare monthly reports regarding the safety performance of the project, including recommendations for improved procedures and methods to improve safety.
CP at 235. Finally, "[t]he CM consultant staff has the authority to stop work immediately if they believe that the safety violation presents an immediate danger to life or health of the CM consultant staff or others on the construction site." CP at 235.
¶ 37 Jacobs's inspectors prepared "daily inspection report[s]." CP at 358. The inspectors were also required to "note safety issues" and prepare "safety observation reports" if they noted lack of compliance with safety responsibilities under the contract. CP at 358. Jacobs's inspectors had authority to discuss safety problems with KST employees. Normally a resolution would occur once the Jacobs inspector brought the safety issue to KST's attention.
¶ 38 Connie Krier, Jacobs's assistant safety manager when Cano-Garcia's injury occurred, testified that even if she saw a safety violation, she would "never tell them something needs to be done." CP at 347. Instead, she would notify KST's safety manager of safety violations and "they would [make corrections] however they saw fit." CP at 347. Critchfield, Jacobs's project manager, similarly testified that Jacobs did not have authority to demand corrections, stating, "We have the authority to call to their attention something that does not [...] conform to the contract, and the County project representative would require the contractor to make that correction." CP at 369. For example, a safety observation report noted unsafe conditions regarding KST employees again wearing rain gear duct taped to boots during a concrete pour after the incident. The "Immediate Corrective Action" notes stated:
I called and spoke to Jack Finn and reminded him of past injuries that had occured [sic] due to concrete pours. Realizing he was not the general super at that time I refreshed his memory about KST's corrective measures of wearing Hip wadders [sic] while working in concrete. I explained [duct] tape around rainpants onto boots was not proper protection. I urged Jack to reconsider the PPE [personal protective equipment] his employees were wearing today. Jack said he would have the employees wear hip wadders [sic].
CP at 280. The contract language and testimony King County and Jacobs provided make it clear that Jacobs did not have authority to require that KST take certain actions.
¶ 39 The evidence Cano-Garcia presented is consistent with Jacobs's explanation of its limited authority during inspections. Cano-Garcia's testimony suggested that Jacobs's inspectors interacted directly with KST employees to demand changes to behavior regarding safety. Specifically, Cano-Garcia testified that he had seen inspectors "mention[] something to someone that was not wearing the protective eye gear." CP at 420. But Cano-Garcia also testified "They did not give us any orders." CP at 420.
¶ 40 We note that Jacobs's inspectors were almost constantly present. Critchfield testified that Jacobs's inspectors "track[ed] the activities of each shift in terms of what [was] occurring, more or less minute by minute throughout the course of the shift." CP at 356. Even taking this into consideration, however, Kamla and the Restatement make it clear that inspecting, making suggestions or recommendations that need not necessarily be followed, and prescribing alterations and deviations is not enough to constitute *46 retained control. Just as a regulatory inspector who checks for compliance with safety regulations would not assume control for safety on the project, Jacobs's inspectors did not control the manner in which safety procedures were conducted. Evidence of inspections, daily reports, safety observation reports, and the safety evaluation scoring form are not sufficient to show a question of material fact as to retained control.
¶ 41 We also note that the parties involved here were highly sophisticated and knowledgeable as to safety requirements and practices. King County commonly handles complex construction projects. Jacobs is a professional construction management firm with highly trained employees. King County and Jacobs had at least the same knowledge of WISHA standards and level of expertise as a general contractor. But regardless of its level of sophistication, the type of authority granted to Jacobs would not be sufficient to actually ensure the protection of workersthe authority to write a report that is then sent to King County for review that might result in a change does not have the same level of control as an employer who can demand immediate action to change unsafe habits. Jacobs could intervene only when the situation involved imminent hazards. Jacobs and King County did not actually ensure safety; they acted only as a safety net to catch problems KST supervisors missed. This alone cannot give rise to liability.

5. Other Conduct Indicating that King County Retained Control
¶ 42 Cano-Garcia contends that several examples of project-wide coordination indicates that King County and Jacobs retained control. Cano-Garcia also contends that an issue of material fact exists as to whether King County in fact acted as the general contractor on this project.
¶ 43 For example, Jacobs prepared a "Construction Management Organization" chart that tracked the interactions between King County, Jacobs, and KST. Jacobs also prepared a "Project Master Schedule," which tracked the schedule of each aspect of the Brightwater project. Maday, King County's project representative, testified that this schedule was an "overall project management tool for the county." CP at 320. Maday testified "we work together and collaborate together to get the job done, which is to manage the KST contract and get the work completed per the contract." CP at 319. Maday testified that Jacobs did not "schedule the work, they don't plan the work, they don't sequence the work, they don't do any of that. That's for each individual contractor to meet his specific contract with the county." CP at 331. Krier testified that the goal of sharing information is to "efficiently build the project as best that they are able." CP at 338.
¶ 44 Additionally, periodic progress and safety meetings were held that included representatives from King County, Jacobs, and KST. Progress meetings involved discussions regarding the work, scheduling, and future work. Safety meetings addressed safety issues. Jacobs also held "team-building workshops" that included King County staff directly involved in construction management activities. CP at 329. Those workshops also included KST personnel. "[T]he goal of these meetings [was] to get all parties to function together as a team." CP at 329.
¶ 45 Viewing the evidence in the light most favorable to Cano-Garcia, this evidence does not show that King County and Jacobs acted as a general contractor. King County and Jacobs did not conduct certain activities generally done by a general contractor, including: provide equipment, schedule work, hire workers, provide procedures and rules, or require KST employees to comply with its rules. For example, with the master schedule, Jacobs did not determine the schedule: it merely produced a schedule with information the general contractors provided in order to ensure communication and efficiency among the many parties working on this complex project.
¶ 46 A comparison to our opinion in Arnold is useful here. In that case, we held that Lockheed, the jobsite owner in that case, acted as the general contractor:
Lockheed constructed and outfitted naval ships at its Seattle shipyard in accordance with the Navy's specifications. *47 Lockheed employed its own workers but also contracted out work to subcontractors. A 1968 contract between Lockheed and Washington State Ferries designates Lockheed as "Contractor" and states that Lockheed will complete work in accordance with stated specifications while providing all "materials, labor, carriage, tools, [and] implements ... for constructing and completing the work provided for in this contract."
Arnold, 157 Wash.App. at 662-63, 240 P.3d 162 (ellipses in Arnold, internal citations omitted). Unlike the jobsite owner in Arnold, King County's and Jacobs's activities did not rise to the level of a general contractor.
¶ 47 Here, KST directed the day-to-day conduct on the jobsite. For example, KST told Cano-Garcia where to work each day. KST told him what to do and how to do it. KST also provided his personal protective equipment and his tools. KST ran the "Take five" safety meetings that Cano-Garcia attended. CP at 381. KST employees would correct Cano-Garcia if they saw him doing something unsafe. KST employees would report safety issues to KST, not to Jacobs.
¶ 48 On the day of his injury, KST assigned Cano-Garcia to the concrete pour position. KST transported him to that area. KST's supervisor gave Cano-Garcia instructions. Cano-Garcia requested waders from the KST supervisor. A KST supervisor told him when he could stop for the day. Cano-Garcia did see people standing from above the location of the pour, but he did not know who they were. Cano-Garcia recognized that the KST supervisor "was the one in charge." CP at 376.
¶ 49 Maday stated in his declaration, "[KST] has complete control over the manner in which it manages and accomplishes its work. [KST] created the project schedule and supervises the day-to-day work of its employees and subcontractors. King County does not direct any of the day-to-day work on the project, nor has it reserved the right to do so." CP at 149. He continued:
King County inspects [KST's] work for the sole purpose of ensuring compliance with the contract. King County contracted with Jacobs Civil, an engineering and construction management firm, to inspect [KST's] work for the sole purpose of ensuring compliance with the contract. Neither King County nor Jacobs Civil supervise [KST's] personnel or control the manner in which work is accomplished they merely monitor the progress of the project to ensure that it is proceeding as scheduled and conforms to the contract.
CP at 149. He continued, "[KST] has sole responsibility for jobsite safety. From time to time, the Jacobs' [sic] personnel might make general safety suggestions, but they are not safety monitors." CP at 149-50. He also declared, "[KST] was responsible for acquiring and maintaining all materials, tools, and machinery necessary to execute and complete the project. King County has not provided any materials, tools, or machinery." CP at 150. Cano-Garcia testified that he did not know any King County employees involved in the project.
¶ 50 This evidence supports King County's and Jacobs's assertion that KST had complete control over the implementation of safety plans. KST acted as the general contractor. Cano-Garcia has presented no direct evidence, beyond his own conclusory testimony, that King County or Jacobs prescribed that KST complete the work in any particular way, except that it was required to do so safely and in compliance with all relevant laws. Cano-Garcia has failed to show an issue of material fact as to whether King County and Jacobs retained the right to control the manner in which Cano-Garcia and his employer, KST, performed their work. Therefore, the trial court did not err in granting summary judgment on these grounds.

III. COMMON LAW DUTY
¶ 51 Cano-Garcia also argues there are material factual questions on whether King County and Jacobs owed him a common law duty to provide a safe workplace in the same *48 manner as a general contractor that has control over the way in which jobs are performed at a construction site. We disagree.
¶ 52 In general, an employer who contracts with an independent contractor is not liable for injuries sustained by an independent contractor's employees. Stute, 114 Wash.2d at 460, 788 P.2d 545; Kelley v. Howard S. Wright Constr. Co., 90 Wash.2d 323, 330, 582 P.2d 500 (1978); RESTATEMENT (SECOND) OF TORTS § 409 (1965). But where the employer retains control over some part of the independent contractor's work, the employer has a duty within the scope of that control to provide a safe place to work. Stute, 114 Wash.2d at 460, 788 P.2d 545; Kennedy v. Sea-Land Serv., Inc., 62 Wash. App. 839, 851, 816 P.2d 75 (1991); RESTATEMENT (SECOND) OF TORTS § 414 (1965). For example, in Kelley, the general contractor expressly assumed responsibility for "supervising and coordinating all aspects of the work" and "agreed to be responsible for `initiating, maintaining and supervising all safety precautions and programs in connection with the work[.]'" 90 Wash.2d at 327, 582 P.2d 500. As such, the Supreme Court held that the exception applied and the general contractor's contractual duty of care to its subcontractor's employees was nondelegable. Kelley, 90 Wash.2d at 333-34, 582 P.2d 500.
¶ 53 Cano-Garcia argues this case is like Kelley and Afoa. We disagree. As discussed above, KST was an independent contractor. King County and Jacobs did not retain the right to control the manner in which KST and its employees completed their work. There is no issue of material fact as to the liability of King County and Jacobs and the trial court properly granted summary judgment on these grounds.

IV. ACTING IN CONCERT
¶ 54 Cano-Garcia next argues that King County, Jacobs, and KST were acting in concert and therefore are each jointly liable for the negligence of any of the actors. RCW 4.22.070(1) states in part:
In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages except entities immune from liability to the claimant under Title 51 RCW .... (a) A party shall be responsible for the fault of another person or for payment of the proportionate share of another party where both were acting in concert or when a person was acting as an agent or servant of the party.
(Emphasis added). RCW 4.22.070 is not relevant here. Application of that statute requires the fault of more than one entity. "`Cooperation in a lawful enterprise, which results in harm to a third person through negligence, does not rise to the high level of concerted activity.'" Gilbert H. Moen Co. v. Island Steel Erectors, Inc., 75 Wash.App. 480, 486, 878 P.2d 1246 (1994), rev'd on other grounds, 128 Wash.2d 745, 912 P.2d 472 (1996) (acting in concert involves an intentional combination of conduct and requires all tortfeasors to actively engage in the wrongful act) (quoting Gregory C. Sisk, Interpretation of the Statutory Modification of Joint and Several Liability: Resisting the Deconstruction of Tort Reform, 16 U. PUGET SOUND L.REV. 1, 107 (1992)) (emphasis omitted). Because Cano-Garcia has proven only that KST is at fault, no joint liability can arise under RCW 4.22.070.[7]

V. BUSINESS INVITEE THEORY
¶ 55 Cano-Garcia also argues that King County breached a duty of care it owed to him as a business invitee on the premises. Because Cano-Garcia did not make this argument at the summary judgment stage, we decline to address it. Cano-Garcia raised this claim in his complaint. Cano-Garcia did not, however, raise this issue in his pleadings in opposition to summary judgment, argue this theory at the hearing, submit evidence in support of this theory, or object to the trial *49 court's order dismissing all claims. Issues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal. RAP 9.12; Green v. Normandy Park Riviera Section Cmty. Club, 137 Wash.App. 665, 687, 151 P.3d 1038 (2007) (contention that was pleaded, but not raised in opposition to summary judgment, cannot be considered for the first time on appeal). Because he failed to raise this argument to the trial court at summary judgment, Cano-Garcia failed to preserve this argument.[8]

VI. CONSIDERATION OF INADMISSIBLE EVIDENCE
¶ 56 Finally, Cano-Garcia argues that the trial court improperly considered evidence of worker's compensation payments and the fault of the immune entity KST. Here, the trial court raised the issue of Cano-Garcia's worker's compensation payments when discussing at the hearing whether granting summary judgment would undermine the purpose of the Stute rule, which is to encourage those in the best position to enforce compliance with safety regulations to do so in order to protect workers. Stute, 114 Wash.2d at 464, 788 P.2d 545.
¶ 57 A trial court may not consider inadmissible evidence when ruling on a motion for summary judgment. King County Fire Prot. Dist. No. 16, v. Hous. Auth., 123 Wash.2d 819, 826, 872 P.2d 516 (1994). We presume the trial court disregarded any inadmissible evidence. See State v. Melton, 63 Wash.App. 63, 68, 817 P.2d 413 (1991) ("A trial judge is presumed to be able to disregard inadmissible evidence."). Assuming without deciding that the contested evidence was not admissible and that this argument is properly preserved, that inadmissible evidence was presented to the trial court, without more, does not require reversal. The record shows no improper reliance on inadmissible evidence. No error resulted here.
¶ 58 Affirmed.
We concur: ARMSTRONG, and QUINN-BRINTNALL, JJ.
NOTES
[1] Ignacio Cano-Garcia and his wife, Maribel Cano, are both appellants in this case. For clarity, we refer to the claims of the injured worker, Cano-Garcia, unless otherwise stated.
[2] "Washington State has abolished workplace injury torts and established Title 51 RCW, the workers' compensation statutes. RCW 51.04.010. Under the statutes, an injured worker generally may not sue in tort, but is instead limited to recovering workers' compensation benefits from the Department [of Labor and Industries]." Tobin v. Dep't of Labor & Indus., 169 Wash.2d 396, 400, 239 P.3d 544 (2010).
[3] Cano-Garcia received worker's compensation payments through the Washington Department of Labor and Industries in the amount of $27,571.64 for medical aid and $13,416.30 for time loss. The Department has filed a notice of statutory interest in recovery in this case, notifying the parties of its right to be reimbursed.
[4] RCW 49.17.060(2) provides that each employer "[s]hall comply with the rules, regulations, and orders promulgated under this chapter."
[5] King County argues that Kamla implicitly overruled Weinert to any extent Weinert is inconsistent with Kamla. In its opinion, the Weinert court did not specify the details of the owner/developer's supervisory authority or activities in the workplace so it is impossible for us to discern whether that opinion is inconsistent with the rule we apply from Kamla to determine whether King County or Jacobs retained "control over the manner in which an independent contractor completes its work" sufficient to owe a duty to enforce safety rules on the jobsite. Kamla, 147 Wash.2d at 125, 52 P.3d 472.
[6] The submittal review process, along with all other communications between the various entities working on the Brightwater project, occurred on Autodesk's "Constructware," a project management system used to store and access documents related to the project and all official communications regarding the project. Cano-Garcia contends that the parties' use of Constructware indicates that King County and Jacobs were acting as general contractors. In fact, the Constructware program merely constituted a method of communication. That King County and Jacobs used Constructware does not independently suggest any retention of control or inherent supervisory authority.
[7] Cano-Garcia argues that Jacobs acted as King County's agent. Because there is no basis for liability for King County, we decline to consider this argument.
[8] Cano-Garcia argues that Afoa, issued after the trial court's ruling on summary judgment, somehow revived his business invitee theory. Cano-Garcia cites no authority for his argument that a subsequently-issued opinion on a similar issue should revive his abandoned argument and we reject it.