# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| POTELCO, INC., | No. 50943-1-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF LABOR AND INDUSTRIES | UNPUBLISHED OPINION |
| Respondent. | |

MELNICK, J. — Potelco, Inc. appeals from a Board of Industrial Insurance Appeals (BIIA) decision affirming its citation for four serious violations and one general violation of the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW. We conclude that substantial evidence supports the BIIA's findings and that it did not abuse its discretion. We affirm.

## FACTS

### I.    INCIDENT

Potelco is a utility contractor that works primarily on high voltage electrical lines in Washington.

A four-man Potelco crew worked on a multi-month project in Olympia to replace a single phase line with a triple phase line. The procedure involved installation of three new power lines followed by removal of the old line. This type of project usually would take about three to four months in total. The crew included apprentice lineman Brent Murphy and journeyman lineman

Benjamin Laufenberg who was the crew foreman and Murphy's supervisor. None of the linemen on this project established an equipotential zone (EPZ)[1] around the work area. After the crew had completed installation of the triple phase line, it turned to removing the replaced single phase line.

On February 14, 2014, Murphy worked with another lineman to remove the single phase line. The process for removing the single line involved deenergizing it, grounding it on both ends, and taking it to the ground without letting it touch any of the new lines which would reenergize it. One lineman went up to cut the wire and drop it down to Murphy, who waited on the ground to receive it.

That same day, Laufenberg worked between 300 and 450 feet away on the same line. Because the line blocked a residential driveway, Laufenberg cut it, but he did not communicate this fact to the rest of the crew.

After the lineman with Murphy dropped the line to the ground, Murphy, who did not know it had been cut, picked it up with his bare hand. He took about three steps and then felt a buzz. Because the line had been cut, Murphy's pulling on it had caused it to touch an energized connection device, energizing the line and shocking him. Murphy also dragged the line over a chain link fence which absorbed the majority of the electric current, burning the fence and saving Murphy from serious injury. Murphy yelled for everyone to stay off the line. Murphy received no injuries besides the tingling in his hand, but, per company policy, he went to the hospital for 12 hours of observation.

After the incident, Potelco disciplined every member of the work crew with a verbal warning and three days of leave without pay.

---

[1] An EPZ is a shunt, such as a conductive mat, that can be put down at a work site to absorb current from an energized line and minimize injury.

50943-1-II

II.    ADMINISTRATIVE ACTION

High voltage compliance inspector George Maxwell investigated the incident.    He conferred with Potelco safety supervisors, interviewed the crew on the project, and inspected the jobsite in March 2014.

After completing his investigation, Maxwell cited Potelco for five WISHA violations. Violation 1-1 was for failing to ensure that the conductor being removed was under positive control while removing it, exposing four employees to an electrocution hazard.  Violation 1-2 was for failing to establish an EPZ, exposing two employees to an electrocution hazard.  Violation 1-3 was for failing to ensure that another employee was present positionally because one employee was on the ground while the other was in an aerial device.  Violation 1-4 was for Potelco's failure to develop a formal accident prevention program (APP) because its safety manual policy was not as effective as a Department of Labor and Industries (L&I) rule.  Violation 2-1 was for failing to enter the number of employees and hours worked into 2013 Occupational Safety and Health Administration (OSHA) form 300A.  Maxwell categorized the first four violations as "serious" and the recordkeeping violation as "general."

For each serious violation, Maxwell assessed a severity rating of 6 out of 6 and a probability rating of 4 out of 6.[2]  Former WAC 296-900-14010 (2006).  Multiplying these together produced a base gravity of 24, for a penalty of $5,500.  Former WAC 296-900-14010.  Maxwell assigned Potelco a good faith rating of "poor," adding an additional 20 percent to each penalty for a total of $6,600 for each of the four serious violations.  Former WAC 296-900-14015 (2006).  Maxwell assessed the lowest possible penalty of $100 for the general violation.

---

[2] Since this case, L&I has reworked its penalty calculation regulations.  *See* WAC 296-900-14010, 14015.  We cite to the WAC penalty calculation provisions in effect at the time of this case.

3

Potelco appealed the citation. L&I held an informal conference and issued a corrective notice of redetermination (CNR). L&I affirmed all five violations from the citation. Potelco appealed again to the BIIA.

A.    BIIA PROCEEDINGS[3]

The BIIA held a hearing in which Murphy, Laufenberg, and Maxwell testified to the above facts. L&I offered into evidence documents regarding three prior WISHA violations by Potelco. Two of these cases involved EPZ rule violations from 2011.

Potelco introduced evidence about its safety program. Potelco policy included random safety audits where auditors inspected jobsites to evaluate them for compliance with Potelco policy and L&I rules. Potelco audited the Olympia jobsite at issue at least once during the project.

Bryan Sabari, Potelco vice president of safety training and compliance, testified that Potelco employees receive 40 to 60 hours of safety training per year. He testified that all employees have the authority to stop work in the case of a safety violation. He also stated that Potelco has taken steps to correct its past EPZ violations by implementing EPZ training programs several times in the past five years. He testified that Potelco addressed the topic in its new hire orientation, as well as in a two-day OSHA course. It also addressed EPZ as a monthly safety topic. Potelco also identified projects that could include EPZ-related hazards and sent a safety person to the pre-job safety meeting to cover the topic with employees. Sabari said he expected employees to follow their safety training.

---

[3] The following proceedings took place before an Industrial Appeals Judge (IAJ) who afterwards entered a proposed decision and order. Potelco petitioned for review by the BIIA, which denied its petition and adopted the IAJ order as its own.

Each day of the project, Laufenberg, as project foreman, would lead a "tailboard" meeting, a pre-job safety briefing that included risks associated with the day's tasks, what hazards and weather conditions to expect, and a general overview of the day's work.

The BIIA issued an order affirming all five violations. Potelco appealed the BIIA order to the superior court, which affirmed all five violations. Potelco appealed that decision to this court.

ANALYSIS

I.    LEGAL PRINCIPLES

We review BIIA decisions directly based on the record before the agency. *W. Oilfields Supply v. Dep't of Labor & Indus.*, 1 Wn. App. 2d 892, 900, 408 P.3d 711 (2017). We review challenged findings of fact to determine whether they are supported by substantial evidence and, if so, whether the findings support the conclusions of law. *J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 35, 42, 156 P.3d 250 (2007). Substantial evidence is "evidence 'in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *J.E. Dunn Nw.*, 139 Wn. App. at 43 (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)).

We do not reweigh the evidence on appeal. *Potelco, Inc. v. Dep't of Labor & Indus.*, 194 Wn. App. 428, 434, 377 P.3d 251, *review denied*, 186 Wn.2d 1024 (2016). In determining whether substantial evidence supports BIIA findings, we view the evidence in the light most favorable to the party that prevailed before the BIIA. *Potelco*, 194 Wn. App. at 434. Unchallenged findings of fact are verities on appeal. *Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus.*, 136 Wn. App. 1, 4, 146 P.3d 1212 (2006). If substantial evidence supports the findings of fact, we decide if those findings support the BIIA's conclusions of law. *Potelco*, 194 Wn. App. at 434.

5

II.   KNOWLEDGE OF VIOLATIONS

Potelco contends that L&I failed to meet its burden to prove Potelco "'knew, or through the exercise of reasonable diligence, could have known'" of the violative conditions underlying violations 1-1, 1-2, and 1-3.  Appellant's Opening Br. at 9 (quoting RCW 49.17.180(6)).

To establish a prima facie case of a serious WISHA violation, L&I must prove

> "(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) there is a substantial probability that death or serious physical harm could result from the violative condition."

*Frank Coluccio Constr. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 36-37, 329 P.3d 91 (2014) (internal quotation marks omitted) (quoting *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 119 Wn. App. 906, 914, 83 P.3d 1012 (2003)).  Potelco challenges only the evidence supporting the fourth element of knowledge.

L&I may show constructive knowledge "through evidence that a violation was in plain view."  *Potelco*, 194 Wn. App. at 439.  Moreover, "when a supervisor has actual or constructive knowledge of a safety violation, such knowledge can be imputed to the employer."  *Potelco*, 194 Wn. App. at 440.  When a work site is exposed, "any bystander—but especially the project foreperson" may observe the violation.  *Potelco*, 194 Wn. App. at 440.

A.   FAILURE TO MAINTAIN POSITIVE CONTROL

Potelco contends that the BIIA erred by finding that Potelco knew of violation 1-1 because constructive knowledge may not be imputed to it based on the length of a job or its past violations.

WAC 296-45-385(2)(b) requires that, when installing and removing overhead conductors or cables, "they shall be kept under positive control to prevent accidental contact with energized circuit."  In this case, Potelco "did not ensure that the conductor being removed was under positive

control when the conductor sagged, contacted an energized stirrup, and grounded to a metal fence when [Brady] grabbed the line and felt a buzz."[4] Administrative Record (AR) at 40.

This violation occurred in plain view of the public and of the project foreman and supervisor, Laufenberg. Like *Potelco*, "any bystander—but especially the project foreperson—could have observed" this violation. 194 Wn. App. at 440.

The BIIA found that Laufenberg was "not a member of management and was hired out of the union hiring hall" and therefore his actual knowledge was not imputed to Potelco. AR at 33. Contrary to this ruling, "when a supervisor has actual or constructive knowledge of a safety violation, such knowledge can be imputed to the employer." *Potelco*, 194 Wn. App. at 440. A management official need not be present to witness the violation. *BD Roofing, Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 98, 108, 161 P.3d 387 (2007). Both Laufenberg's actual knowledge as foreman and the violation's presence in plain view provided sufficient evidence to impute knowledge to Potelco.[5]

B.    FAILURE TO ESTABLISH EPZ

Potelco contends that the BIIA erred by imputing to Potelco knowledge of the EPZ violation. It argues that the developments in its EPZ training program since its prior violations prevent those violations from contributing to its constructive knowledge. We disagree.

---

[4] This unchallenged finding is a verity on appeal. *Mid Mountain Contractors*, 136 Wn. App. at 4.

[5] The BIIA relied on Potelco's history of prior violations to find knowledge of this violation. The record does not contain evidence of any past violations of this rule by Potelco. However, substantial evidence exists to impute knowledge of this violation to Potelco.

Former WAC 296-45-345(3) (1998) requires "that workers create an EPZ before grounding and performing work on transmission and distribution lines."[6] *Potelco*, 194 Wn. App. at 435. The linemen did not employ an EPZ or any other form of protective grounding in this case.

Like the failure to maintain positive control violation above, this violation occurred on the side of the road where the crew worked, in plain view of supervisor Laufenberg and any other safety inspector or member of Potelco management. Accordingly, knowledge can be imputed to Potelco.

Additionally, "[e]vidence of an employer's knowledge of 'similar past violations' is sufficient to support a finding that the employer, with the exercise of reasonable diligence, would have known of the existence of a violation." *J.E. Dunn Nw.*, 139 Wn. App. at 45-46 (quoting *Wash. Cedar & Supply*, 119 Wn. App. at 916). In *Washington Cedar*, we affirmed a finding of imputed knowledge based on two similar violations within the past three years. 119 Wn. App. at 910, 916.

L&I introduced evidence that Potelco had previously violated the EPZ rule in two separate cases stemming from incidents in 2011. Like *Washington Cedar*, Potelco can alternatively be imputed knowledge of the EPZ violation based on its two prior violations of the same rule in the past three years.

Potelco contends that it has taken extensive measures to improve its EPZ training program since the 2011 incidents. However, as discussed further below, Potelco has not shown any improvements to its EPZ safety program in practice.

---

[6] The regulation stated, "Temporary protective grounds shall be placed at such locations and arranged in such a manner as to prevent each employee from being exposed to hazardous differences in electrical potential." Former WAC 296-45-345(3).

C.      VIOLATION OF TWO-PERSON RULE

Potelco contends that it did not have knowledge of violation 1-3,[7] but does not provide any substantive argument on this issue. Accordingly, we do not consider Potelco's argument. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *see* RAP 10.3(a)(6).

III.      ACCIDENT PREVENTION PROGRAM

Potelco contends that L&I failed to show that its APP is less effective than WAC 296-45-325(2)(b). It claims that its APP adequately addresses the needs of its workplace. Potelco does not challenge the BIIA's findings with regard to the APP violation.

WAC 296-800-14005 requires that employers develop a formal accident prevention program outlined in writing. The program must be tailored to the needs of the employer's particular workplace or operation and to the types of hazards involved. WAC 296-800-14005.

Maxwell testified that the APP violation was based on Potelco's APP's instruction to have one employee on the ground and another in the air, in violation of the two-person rule. However, the BIIA concluded that the APP violation was based on Laufenberg's failure to update the APP after he cut the line. The BIIA's characterization of violation 1-4 is unsupported by the record and it is unclear whether an employer must update the APP in response to specific events at a particular jobsite.

---

[7] Violation 1-3 was for violating the two-person rule, which requires at least two qualified electrical employees to be present while installing, removing, or repairing deenergized lines if an employee is exposed to contact with lines energized at more than 600 volts. WAC 296-45-325(2)(b). A note to the rule states that one employee should serve as a "standby person who must be so located that they may physically reach the other employee in the event of an accident either with their hand or with a hot stick twelve feet or less in length." Former WAC 296-45-325 Note 1 (2005). Potelco violated this rule when one lineman went into the air to cut the wire while Murphy remained on the ground to receive it and they were too far apart to physically reach one another.

However, the BIIA found that Potelco "failed to update an [APP] tailored to the needs of the particular workplace or operation and to the types of hazards involved" in the project at issue in this case. AR at 40. Potelco does not assign error to the BIIA finding on this issue. As an unchallenged finding, the BIIA ruling is a verity on appeal. *Mid Mountain Contractors*, 136 Wn. App. at 4. Potelco does not provide any argument that the BIIA erred with respect to this issue so we affirm its ruling.

IV.     UNPREVENTABLE EMPLOYEE MISCONDUCT

Potelco contends that the first three violations were the result of unpreventable employee misconduct. It claims that it provides extensive and effective safety training to its employees and that the BIIA disregarded Sabari's testimony about its safety program and efforts it has taken to specifically address EPZ safety and compliance. We disagree.

Once L&I has established a prima facie case of a WISHA violation, the burden shifts to the employer "who can avoid a finding against it if it can establish that 'unpreventable employee misconduct' was the actual cause of the violation." *J.E. Dunn Nw.*, 139 Wn. App. at 46 (quoting RCW 49.17.120(5)(a)). To show unpreventable employee misconduct, the employer must show

> (i) [a] thorough safety program, including work rules, training, and equipment designed to prevent the violation;
> (ii) Adequate communication of these rules to employees;
> (iii) Steps to discover and correct violations of its safety rules; and
> (iv) Effective enforcement of its safety program as written in practice and not just in theory.

RCW 49.17.120(5)(a).

"To show that a safety program is effective in practice, evidence must support the employer's assertion that the employees' misconduct was an isolated occurrence and was not foreseeable." *BD Roofing*, 139 Wn. App. at 111. "Merely showing a good paper program does not demonstrate effectiveness in practice." *BD Roofing*, 139 Wn. App. at 113. We review whether

an employer has established this affirmative defense by determining whether substantial evidence in the record supports the BIIA's determination. *See Wash. Cedar & Supply*, 119 Wn. App. at 912; *BD Roofing*, 139 Wn. App. at 114.

"When a supervisor is involved in a violation, 'the proof of unpreventable employee misconduct is more rigorous and the defense is more difficult to establish since it is the supervisor's duty to protect the safety of employees under his supervision.'" *Potelco*, 194 Wn. App. at 437 (quoting *Sec'y of Labor v. Archer-W. Contractors Ltd.*, 15 BNA OSHC 1013, 1017 (No. 87-1067, 1991)). Supervisor participation in or failure to enforce a safety rule does not preclude the defense of unpreventable employee misconduct, but it weighs against it. *Potelco*, 194 Wn. App. at 437.

"[T]he existence of prior violations does not absolutely bar use of the unpreventable employee misconduct defense," but it is "evidence that the employee conduct was foreseeable and preventable." *Wash. Cedar & Supply*, 119 Wn. App. at 913. Prior violations may "provide sufficient evidence to support the [BIIA's] conclusion" that the defense did not apply because they show that the violation was foreseeable. *Wash. Cedar & Supply*, 119 Wn. App. at 913.

In *BD Roofing*, the employer introduced evidence that its safety inspectors had authority to hire and fire employees based on safety concerns, that employees could face dismissal for failure to follow safety protocols, and, in the opinion of an independent safety consultant, that its disciplinary program effectively enforced company safety regulations. 139 Wn. App. at 112. However, it provided no evidence that its inspectors had actually fired employees for violating safety rules. *BD Roofing*, 139 Wn. App. at 113. Further, the type of violations at issue "were clearly a recurring and foreseeable problem for BD," as there had been seven repeat violations in the previous three years. *BD Roofing*, 139 Wn. App. at 114. The court held that "[t]he fact that a company's written policy on the date of the inspection provided that an employee could face

11

dismissal for failing to follow the employer's safety protocols is not sufficient evidence that the employer actually enforced the policy or dismissed any employees." *BD Roofing*, 139 Wn. App. at 113.

In this case, Sabari testified about Potelco's safety program. He detailed Potelco's safety training practices, the structure of the safety department, the methodology of internal safety audits, and the disciplinary policy in case of violations. Sabari testified that the safety department is not involved in discipline; rather, supervisors decide how to discipline employees depending on the circumstances of a given violation. Potelco did not present any evidence of specific examples of corrective or disciplinary action other than overarching changes to its safety training and the discipline of the four linemen involved in this case.

Potelco did not meet its burden to demonstrate effective implementation of its safety program in practice. Additionally, Potelco's prior EPZ violations provide evidence that the EPZ violation was foreseeable and the project foreman's involvement in the violations further weighs against the defense in this case. Substantial evidence supports the BIIA's findings that none of the violations were isolated instances of unpreventable employee misconduct.

V.      RECORDKEEPING VIOLATION

Potelco acknowledges that it violated WISHA by failing to catalogue its number of employees and hours worked. However, it contends that the BIIA should have categorized this violation as de minimis, rather than as a general violation, because the violation had no direct or immediate impact on safety or health of employees.

WAC 296-27-02105(2)(b) requires employers to complete an annual summary, including the annual average number of employees covered by the OSHA 300 Log and the total hours worked by all employees covered by the OSHA 300 Log.[8]

RCW 49.17.180(3) provides L&I with authority to cite employers for what both parties refer to as "general violations." It states that any violation of a safety or health standard promulgated under this chapter or any L&I regulation governing conditions of employment that is not "of a serious nature"[9] may be assessed a civil penalty up of to $7,000 "unless such violation is determined to be de minimis." RCW 49.17.180(3). The term "general violation" does not itself appear in WISHA; however, the parties seem to use that term to mean a violation that is neither "serious" nor "de minimis."[10]

RCW 49.17.120(2) states that L&I "may prescribe procedures for the issuance of a notice in lieu of a citation with respect to de minimis violations which have no direct or immediate relationship to safety or health." This statute provides L&I with discretion to categorize a violation as de minimis. L&I exercised its discretion and the BIIA did not err by declining to change L&I's categorization as "general" in this case.

---

[8] WAC 296-27-02105 has been amended since this case. Because the amendments did not affect this requirement, we cite to the current version of the regulation.

[9] A "serious violation" is one that causes "a substantial probability that death or serious physical harm could result." RCW 49.17.180(6).

[10] After the 2015 amendments, the L&I penalty scheme discusses penalty calculations for "general violations," but the version in effect at the time of the incident in this case did not do so. WAC 296-900-14010, *cf.* former WAC 296-900-14010 (2006).

VI.     GOOD FAITH RATING

Potelco contends that the BIIA erred in assessing its penalty by assigning a good faith rating of "poor," effecting a 20 percent penalty increase. It claims that its cooperation with Maxwell's investigation necessitated a good faith rating of "good."

WISHA gives L&I the authority to assess penalties giving due consideration to "the number of affected employees of the employer being charged, the gravity of the violation, the size of the employer's business, the good faith of the employer, and the history of previous violations." RCW 49.17.180(7).

L&I regulations provide a formula for calculating WISHA penalties based on the statutory factors.[11] One factor L&I considers is the good faith rating of the employer. Former WAC 296-900-14015. If the employer has an excellent rating, the penalty is reduced by 35 percent; if it has a good rating, the penalty is reduced by 20 percent; if it has a poor rating, the penalty is increased by 20 percent; and if it has an average rating, the penalty is not adjusted. Former WAC 296-900-14015 (Table 5).

In determining good faith, the BIIA considers whether the employer "(1) took prompt action to understand and comply with the regulation, (2) cooperated with the investigation, (3) worked with [L&I] to resolve the problem, and (4) appeared committed to assuring a safe and

---

[11] L&I amended its penalty calculation rules in 2015. WSR 15-13-049. All following citations to chapter 296-900 WAC are to the code as it existed prior to those amendments.

healthful workplace." *Danzer v. Dep't of Labor & Indus.*, 104 Wn. App. 307, 324, 16 P.3d 35 (2000). Conscious disregard of risks, delays in correcting a violation, deceptive behavior, and willful resistance to compliance are all indicative of a lack of good faith. *Danzer*, 104 Wn. App. at 324. We review the penalty amount for an abuse of discretion. *Danzer*, 104 Wn. App. at 326.

In this case, to calculate Potelco's penalties for violations 1-1, 1-2, 1-3, and 1-4, Maxwell assigned each violation a severity rating of 6 and a probability rating of 4. *See* former WAC 296-900-14010. He multiplied these numbers together to get a gravity rating of 24, setting the penalty for each of those violations at $5,500. *See* former WAC 296-900-14010. Maxwell assigned Potelco a good faith rating of "poor" for each of those violations, adding 20 percent to each penalty for a total of $6,600 for each. *See* former WAC 296-900-14015.

Maxwell assigned Potelco a "poor" good faith rating because he did not receive all of the documentation he requested and was unable to interview a Potelco supervisor. Near the end of his investigation, Maxwell received an e-mail from Potelco's attorney confirming that he did not need any additional documents and responded by leaving her a voicemail. Maxwell did not recall the content of the voicemail, but believed he had requested some photographs and never received them. The record does not indicate whether there was any further communication between Maxwell and the attorney. The BIIA did not abuse its discretion by finding that Potelco had a "poor" good faith rating.

50943-1-II

We affirm each WISHA violation and the BIIA's penalty calculation.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, P.J.

_____
Johanson, J.

16