# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PULTE HOMES OF WASHINGTON, INC., | No. 59943-1-II |
| Appellant, | |
| v. | ORDER GRANTING MOTION |
| | TO PUBLISH |
| DEPARTMENT OF LABOR AND INDUSTRIES DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, | |
| Respondent. | |

Respondent, Department of Labor and Industries, moves this court to publish its February 10, 2026 opinion. After consideration, we grant the motion. It is

ORDERED that the final paragraph in the opinion that reads, "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

ORDERED that the opinion will now be published.

SO ORDERED.

Panel: Jj. Maxa, Veljacic, Price

FOR THE COURT:

_____
Veljacic, C.J.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PULTE HOMES OF WASHINGTON, INC., | No. 59943-1-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF LABOR AND INDUSTRIES DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, | UNPUBLISHED OPINION |
| Respondent. | |

VELJACIC, A.C.J. — Pulte Homes of Washington, Inc. is a residential property developer. In 2021, Pulte was developing townhomes on Bainbridge Island and had enlisted Surface Solutions, a contractor, to install waterproof coating on the decks of all units. Armando Ramirez, one of Surface Solutions's employees, worked on a deck 20 to 25 feet high without fall protection, violating WAC 296-880-20005(1). Surface Solutions also did not have a fall protection work plan available at the worksite even though its employees were working at heights greater than 10 feet, violating WAC 296-880-10020(1). The Division of Occupational Safety and Health for the Department of Labor and Industries (Department) issued Pulte a citation and notice of assessment for their noncompliance. Pulte pursued an administrative appeal, and the Board of Industrial Insurance Appeals (Board) affirmed the citation and notice of assessment. The trial court affirmed the Board's order.

Pulte raises several arguments on appeal. First, Pulte argues that the Board erroneously concluded that Pulte was a jobsite owner that retained sufficient control over the manner and instrumentalities with which Surface Solutions performed its work to establish liability under the Washington Industrial Safety and Health Act (WISHA). Second, Pulte claims that the Board erroneously concluded that Pulte had constructive knowledge of Surface Solutions's violation, which supported the Department's determination that the violation was "serious." And third, Pulte asserts that the Board erroneously affirmed the penalty assessment. Because we conclude that substantial evidence supported the Board's findings, and those findings support the Board's conclusions, we affirm.

FACTS

I. BACKGROUND ON THE "275 DEGREES PROJECT"

In 2021 alone, Pulte, a residential property developer, had approximately ten active projects in the state of Washington. One of these projects included the 275 Degrees Project on Bainbridge Island. The project was "a multifamily site consisting of 24 [luxury] units[] [with] a total of six buildings." Clerk's Papers (CP) at 190. Pulte owned and developed the site. Pulte did not have a general contractor that managed the development of the site; instead, Pulte would contract with other contractors to perform the work, which would be overseen by a construction manager employed by Pulte.

Nicholas Lavaring was the construction manager for the 275 Degrees Project. As the construction manager for the site, Lavaring testified that his job was to "maintain the site" and "ensure that the [contractors were] doing what they're supposed to be doing in a safe and proper standard in accordance with the safety guidelines that are given through [the Department]." CP at 189. Lavaring also ensured contractors "installed [products] in accordance with the plans and

3

permits that [were] approved by the municipalities." CP at 189. Lavaring's office was offsite, but at the beginning of each day, he would open "up the entire site and [meet] with the [contractors]." CP at 201. Even though his office was offsite, Lavaring would conduct walkthroughs of the jobsite "anywhere from six to seven times a day, if not more." CP at 218.

When doing walkthroughs, Lavaring would look for safety violations. If Lavaring observed any violation, he would implement a four-step progressive discipline process. Initially, Lavaring would warn the individual of the violation as it was happening and notify their supervisor. If the violation persisted, Lavaring would rely on other tactics such as documenting the incident, imposing a fine, and, in the most serious case, removing the individual and contractor from the jobsite. Lavaring also conducted "toolbox talks" with all contractors, which were "brief safety meetings" that went over "common safety practices that occur throughout the site." CP at 216. And Lavaring oversaw the scheduling of contractors on the jobsite.

In addition to overseeing the development of the 275 Degrees Project and adherence to safety protocols, Lavaring acted "as the face of Pulte" and interacted with homeowners directly. CP at 208. Lavaring would sell properties and walk "homeowners through their build process." CP at 286.

II.    PULTE'S RELATIONSHIP WITH SURFACE SOLUTIONS

Pulte contracted with Surface Solutions to install waterproofing on all decks for the units at the 275 Degrees Project. Since 2017, Surface Solutions had done about 15 projects for Pulte.

A master trade contractor agreement (MTCA) outlined the expectations and obligations of Pulte and Surface Solutions. Under the terms of the MTCA, Surface Solutions had to "furnish, at its own cost and expense, all [w]ork, [m]aterials . . . , tools, facilities, heat, appliances[,] and fans." CP at 320. Surface Solutions was also "solely responsible for the finished quality of its [w]ork."

CP at 327. Regarding safety, the MCTA also required Surface Solutions to comply with all applicable safety regulations. And the MTCA outlined that Surface Solutions was obligated to "provide personal protective equipment to [its] employees," as well as train its employees on "all precautionary measures necessary to protect such employees." CP at 288, 322. Moreover, the MTCA stated a contractor would

> fully comply (and [would] cause its employees and Agents to comply) with any Project jobsite rules or regulations, *including those that relate to safety*, *that Pulte may choose to put in place*. Even though Pulte may put some safety-related rules and regulations in place, Contractor acknowledges that it continues to be responsible for the safety of its employees and Agents and that *Pulte assumes no responsibility or obligation for their safety*.

CP at 322 (emphasis added).

III.    THE BASIS FOR PULTE'S CITATION

On April 22, 2021, between 7:30 a.m. and 8:00 a.m., Lavaring "opened up the entire site and met with the" contractors, including Surface Solutions. CP at 201. There were 3 to 4 contractors and approximately 20 to 30 people at the worksite. It was Surface Solutions's first day on the site, so Lavaring "informed them where to go" and "what to do." CP at 201. Lavaring assumed that Surface Solutions was "going to post [its] fall protection plan" like they had always done in the past. CP at 201. Afterward, Lavaring left the worksite to attend a sales office meeting between 10:00 a.m. and 11:00 a.m. Lavaring did not confirm that Surface Solutions had posted a fall protection plan prior to leaving the worksite.

Surface Solutions proceeded with its work on the townhomes as directed by Pulte. Armando Ramirez, employed by Surface Solutions, "was working on preparing or at least doing the deck prep work" on one of the decks that was about 20 to 40 feet above the ground. CP at 175.

Around 2:25 p.m., the Department came to inspect the 275 Degrees Project worksite after receiving a separate complaint for a different contractor from a bystander. After determining that

there was no violation with that contractor, the Department's inspector, Hayden Smith, walked "around the outside of the site and . . . ended up seeing" a worker, later determined to be Ramirez, "working close to an edge" without any fall protection.[1]  CP at 236.

Smith observed Ramirez working near a ledge on a structure that was 20 to 25 feet high. Smith also noted that Ramirez was not wearing any fall protection.



CP at 315.  Smith called Ramirez down to conduct an employee interview.  Ramirez explained that he had been working on the deck for about five hours and was not wearing fall protection because he had forgotten it.  Ramirez left the worksite after talking with Smith.

Smith proceeded to talk with Alan Pfanders, the owner of Surface Solutions, during his inspection.  Pfanders acknowledged that Ramirez "knew better and that [Ramirez] should have

---

[1] The Board's order found that it was a bystander that observed Ramirez working on the deck without any fall protection.  But the record supports that it was Smith, the Department's inspector, that discovered Surface Solutions's violation, not a bystander.  The bystander called the Department regarding the alleged violation by a different contractor at the worksite.

had" a safety harness on. CP at 247. Pfanders explained that he "did not plan well that morning and [he] did not have [a] safety harness available for [Ramirez's] use." CP at 180. Pfanders also confirmed that they usually developed a fall protection work plan, but they did not have one with them that day. But according to Pfanders, "a request was not made to [him] to submit" a fall protection work plan, which would have come from Lavaring. CP at 176. However, Pfanders later testified that he knew that it was his responsibility to provide his employees "with all necessary personal protective equipment" and to "submit a fall protection plan." CP at 176, 182. Pfanders also testified that since 2017, Pulte, with the exception of one other job, would install railings around the decks that Surface Solutions worked on, which made other fall protection measures such as safety harnesses unnecessary.

After interviewing Pfanders, Smith talked with Lavaring. Lavaring provided Smith with all safety documents, except for a fall protection work plan for Surface Solutions. Lavaring later testified that he was "aware that [Surface Solutions] would be exposed to a fall hazard" at the worksite. CP at 198. And Lavaring testified that he was aware of the requirements to install safety rails or block off hazard zones when proper fall protection was not available. Pulte did not install railings on the decks for the 275 Degrees Project because it had already installed the "engineered house paper" (Typar) and did not want to damage the lining. CP at 212. Pulte had the framing contractor put up "two 2 by 4s, one across the middle portion of the [sliding glass door opening to the upper deck] and then one on the bottom portion with a small sign stating that" the deck was not safe. CP at 212.

7

When asked about Surface Solutions's approach to waterproofing multiple decks in a unit, Lavaring testified that he did not "have an understanding as to what [Surface Solutions] prefer[red] to do or how [Surface Solutions] would start" the waterproofing process.[2]  CP at 229.

## IV.     PULTE'S CITATION

After the inspection, the Department issued a citation and a notice of assessment against Pulte.  The Department concluded that Pulte, as a general contractor or upper-tier contractor, did not fulfill its "non-delegable duty to ensure compliance with all applicable WISHA regulations for every employee on the jobsite."  CP at 405.  The Department determined that Pulte violated WAC 296-880-20005(1) because Ramirez was working near a ledge greater than 4 feet without fall protection.  And the Department also determined that Pulte violated WAC 296-880-10020(1) because Ramirez was working near a ledge greater than 10 feet and there was not a work plan posted on the jobsite for Surface Solutions.  The violations were classified as "serious" because "[a] fall from 20-25 feet would [have] likely result[ed] in permanent disability or death."  CP at 404.  The Department fined Pulte $6,000.

## V.     PROCEDURAL HISTORY

Pulte appealed the citation and notice of assessment.  The Department affirmed the citation in a corrective notice of redetermination.  Then, Pulte appealed the Department's decision to the

---

[2] For context, the line of questioning went as follows:

> Q. . . .  Is it your understanding that [Surface Solutions] would have worked from the bottom up rather than working the top deck then working the lower deck?
> A. . . . I'm not really sure how [Surface Solutions would] go about it, whether they start on the top or they start on the second floor. . . .  I don't have an understanding as to what they prefer to do or how they would start each individual one.

CP at 229.

Board.  A hearing examiner for the Board entered a proposed decision and order vacating the corrective notice of redetermination.  The hearing examiner concluded that Pulte "did not retain the right to control the manner in which Surface Solutions performed their work," so it could not be responsible for Surface Solutions's violation of WISHA regulations.  CP at 89.

The Department petitioned for review before the Board.  The Board granted review and issued a decision and order affirming the corrective notice of redetermination.  In its decision and order, the Board's findings of fact at issue are as follows:

> 3. Pulte Homes used its onsite construction manager and employee, Nicholas Lavaring, to stage and supervise the work of contractors on the site.  Mr. Lavaring's description of his duties and actions were: to basically maintain the site, to ensure that the [contractors] are doing what they're supposed to be doing in a safe and proper standard in accordance with the safety guidelines that are given through [the Department], and ensure that the products that they are installing are installed in accordance with the plans and permits that are approved by the municipalities.
>
> 4. With regard to safety in more particulars, Pulte Homes and Mr. Lavaring retained the authority to inspect the safety practices of contractors and to discipline and penalize contractors for unsafe practices or rule violations.  On site, Mr. Lavaring had only a general overall safety plan applicable to all contract work, and he was supposed to require that contractors have, provide, and post their own job-specific safety plans.  Surface Solutions, a contractor on site on April 22, 2021, by way of its owner, Alan Pfanders, had not seen Pulte Homes' overall safety plan.  And, Surface Solutions did not have, provide, or post a job-specific safety plan of its own, nor did Mr. Lavaring request one from Surface Solutions.
>
> 5. Surface Solutions relied upon Pulte Homes to arrange for the placement of safety railings on condominium decks to protect its workers from fall hazards and did not provide its workers with other fall protection such as fall restraint harnesses.  On April 22, 2021, a Surface Solutions worker, Armando Ramirez, arrived on site after Mr. Lavaring had earlier been present, but while Mr. Lavaring was attending to other business.  Mr. Ramirez began surfacing work on a high condominium deck, near the edge, exposed to a 20-foot or more fall, without an installed guard railing and without any alternate fall protection.  The absence of the railing and Mr. Ramirez's exposure to the hazard of a fall was in plain view and had been noticed and reported by a bystander.  On the day of the inspection perhaps three or four subcontractors were on the worksite with 20 to 30 workers.
>
> 6. Had reasonable diligence been exercised such as observing, reasoning from experience, and inquiry, Mr. Lavaring or another Pulte Homes representative with the retained authority should have known that no guard rails were in place on the high balcony upon which Mr. Ramirez or some other Surface Solutions worker

would be working that day and exposed to fall hazard and should have known that no alternative fall restraint equipment was available or used by Mr. Ramirez.

7. Had reasonable diligence been exercised such as examining records and postings, Mr. Lavaring or another Pulte Homes representative with the retained authority would have known that no job-specific fall protection work plan was on site to be communicated to workers, neither one created by Pulte Homes nor by Surface Solutions.

8. The failure of Pulte Homes to ensure adequate fall protection was in place and utilized, and the failure to ensure an adequate job-specific fall protection work plan was on site and communicated, together and each separately, created a substantial risk of serious bodily harm or death.

9. Penalty calculation was correctly entered by the inspector to reflect: values of 3 for severity and 2 for probability which, multiplied one by the other, results in a gravity figure of 6, which under the applicable tables calls for a base penalty of $6,000. The input of "average" fairly and accurately describes Pulte Homes" "good faith" score and does not require an adjustment to the base penalty. The size of Pulte Homes exceeds the 251-employee threshold and does not require a base penalty adjustment. The Department reasonably acted within its discretion to group the two citations and assess only a single penalty of $6,000.

CP at 16-17. And the Board's conclusions of law at issue are as follows:

3. Under applicable law, the Department of Labor and Industries was correct in its determination that Pulte Homes of Washington, on April 22, 2021, on the jobsite referred to as "275 Degrees Project" on Bainbridge Island, retained sufficient supervisory control over the actions of its contractor Surface Solutions so as to be held liable for violations of fall protection regulations and job-specific safety plan violations relative to the work of Surface Solutions.

4. Pulte Homes was correctly cited for the violations of WAC 296-880-20005(1) and WAC 296-880-10020(1), which occurred on its owner/developer jobsite on April 22, 2021, and of which it had constructive knowledge.

5. The characterization by the Department of citations 1-1a and 1-1b as "serious" within the meaning of RCW 49.17.180(7) is correct.

6. A proper, correct penalty assessment against Pulte Homes for the violations under WAC 296-900-14010 and 296-90014015 is $6,000.

7. Corrective Notice of Redetermination No. 317963699 issued by the Department of Labor and Industries on August 31, 2021, is correct and is affirmed.

CP at 18.

Pulte appealed the Board's decision and order to the Kitsap County Superior Court. The trial court affirmed the Board's decision and order.

Pulte appeals.

10

ANALYSIS

WISHA, chapter 49.17 RCW, governs our review of a Board decision. *Bayley Constr. v. Dep't of Lab. & Indus.*, 10 Wn. App. 2d 768, 781, 450 P.3d 647 (2019); RCW 49.17.150(1). "In an appeal of the [trial] court order affirming the decision of the Board, we review the Board's decision directly, based on the record before the Board." *Bayley Constr.*, 10 Wn. App. 2d at 782.

In a WISHA appeal, the Board's findings of fact are conclusive if supported by substantial evidence. *Ostrom Mushroom Farm Co. v. Dep't of Lab. & Indus.*, 13 Wn. App. 2d 262, 271, 463 P.3d 149 (2020). Evidence is substantial if it is sufficient in quantity to persuade a fair-minded person of its truth. *Id.* We view the evidence and all reasonable inferences that can be drawn from that evidence in favor of the party that prevailed in front of the Board, here, the Department. *Id.* If there is substantial evidence to support the findings of fact, we then determine whether those findings support the Board's conclusions of law. *Id.* We review the conclusions of law de novo. *Id.* at 272.

We do not reweigh the evidence on appeal. *Id.* The possibility of drawing different conclusions from the evidence does not prevent an administrative agency's findings of fact from being supported by substantial evidence. *Id.* at 271-72.

We construe WISHA liberally to reflect the purpose of providing safe working environments to workers in Washington. *Id.* at 272; RCW 49.17.010. We give substantial weight to the Department's interpretation of statutes and regulations within its area of expertise and will uphold that interpretation if doing so does not contradict the legislative intent. *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 272.

I.      SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S CONCLUSION THAT PULTE RETAINED SUFFICIENT CONTROL OVER SURFACE SOLUTIONS TO ESTABLISH A DUTY AS A JOBSITE OWNER UNDER WISHA

Pulte argues that the Board's findings, specifically, findings of fact 3, 4, and 5, regarding Pulte retaining sufficient control over Surface Solutions to warrant liability under WISHA were not supported by substantial evidence and therefore do not support conclusions of law 3 and 4. We disagree and hold that substantial evidence supports the Board's conclusion that Pulte had a duty to enforce WISHA regulations.

Under WISHA, an employer:

> (1) Shall furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees: PROVIDED, That no citation or order assessing a penalty shall be issued to any employer solely under the authority of this subsection except where no applicable rule or regulation has been adopted by the department covering the unsafe or unhealthful condition of employment at the workplace; and
> (2) Shall comply with the rules, regulations, and orders promulgated under this chapter.

RCW 49.17.060. "Subsection (1) creates a 'general duty' to maintain a workplace free from recognized hazards; this duty runs only from an employer to its employees." *Afoa v. Port of Seattle*, 176 Wn.2d 460, 471, 296 P.3d 800 (2013) [*Afoa* I] (quoting *Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 671, 709 P.2d 774 (1985)). "Subsection (2), on the other hand, creates a 'specific duty' for its employees to comply with WISHA regulations." *Afoa* I, 176 Wn.2d at 471 (quoting *Goucher*, 104 Wn.2d at 671). "Unlike the general duty, the specific duty runs to *any* employee who may be harmed by the employer's violation of the safety rules." *Afoa* I, 176 Wn.2d at 471.

In *Stute v. P.B.M.C., Inc.*, our Supreme Court established per se liability against general contractors for violations of safety regulations under WISHA. 114 Wn.2d 454, 464, 788 P.2d 545 (1990). The court reasoned that because general contractors had "innate supervisory authority . .

. over the workplace," they bore "primary responsibility for compliance with safety regulations."

*Id.*

Unlike general contractors, jobsite owners do not have per se liability under WISHA. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 123-24, 52 P.3d 472 (2002). Instead, a jobsite owner only has a duty when it has the same innate overall supervisory authority as the general contractor and is in the best position to enforce compliance with safety regulations. *Id.*; *Afoa v. Port of Seattle*, 191 Wn.2d 110, 121, 421 P.3d 903 (2018) [*Afoa* II]. More specifically, a jobsite owner must "retain control over the manner in which an independent contractor completes its work" to have a duty under WISHA. *Kamla*, 147 Wn.2d at 125.

In *Kamla*, our Supreme Court reasoned,

> Although jobsite owners may have a similar degree of authority to control jobsite work conditions, they do not necessarily have a similar degree of knowledge or expertise about WISHA compliant work conditions. Jobsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade. Because jobsite owners may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, it is unrealistic to conclude all jobsite owners necessarily control work conditions. Instead, some jobsite owners may reasonably rely on the contractors they hire to ensure WISHA compliance because those jobsite owners cannot practically instruct contractors on how to complete the work safely and properly.

*Id.* at 124-25. "[M]ultiple entities—jobsite owners, general contractors, subcontractors—may concurrently owe independent yet overlapping duties to maintain a safe workplace. *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 739, 452 P.3d 1205 (2019).

"The test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control." *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 330-331, 582 P.2d 500 (1978). "'It is not enough that [the jobsite owner] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make

suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.'" *Kamla,* 147 Wn.2d at 121 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). "'There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS). If a jobsite owner does not retain control over the manner in which an independent contractor completes its work, the jobsite owner does not have a duty under WISHA to "comply with the rules, regulations, and orders promulgated under [chapter 49.17 RCW]." RCW 49.17.060(2)).

Courts look to factors such as "'the parties' contract . . . [or] the parties' conduct'" to determine whether a jobsite owner retained control. *Cano-Garcia v. King County*, 168 Wn. App. 223, 235, 277 P.3d 34 (2012) (quoting *Phillips v. Kaiser Aluminum & Chem. Corp.*, 74 Wn. App. 741, 750, 875 P.2d 1228 (1994)). Contract language alone, however, "cannot defeat other evidence that shows retained control." *Cano-Garcia*, 168 Wn. App. at 235-36.

When viewing the record in the light most favorable to the Department, substantial evidence supports the Board's findings that Pulte exercised sufficient control over Surface Solutions to establish a duty as a jobsite owner under WISHA. Pulte points to the terms of the MTCA to demonstrate that it did not retain control over Surface Solutions.

Pulte's reliance on the MTCA's terms fails for two reasons. First, relevant provisions of the MTCA itself show that Pulte retained a degree of control over the manner that Surface Solutions performed its work. For example, the MTCA states that a contractor was required to "fully comply (and . . . cause its employees and Agents to comply) with any Project jobsite rules or regulations, including those that relate to safety, *that Pulte may choose to put in place.*" CP at 322 (emphasis added). Pulte points out contradictory terms of the MTCA that appear to show

Pulte lacks control. Notably, in the same provision previously referenced, the MTCA states that the "Contractor acknowledges that it is . . . responsible for the safety of its employees and Agents and that Pulte *assumes no responsibility or obligation for their safety*." CP at 322. But again, when viewing the record in the light most favorable to the Department, the MTCA shows that Pulte retained control over the manner Surface Solutions performed its work.

Second, Pulte's conduct at the 275 Degrees Project undermines the language of the MTCA, which suggested that Pulte assumes no responsibility for safety. Lavaring testified that his job not only focused on being "the face of Pulte," but it also included maintaining the jobsite and ensuring the contractors complied with the workplans, permits, and safety regulations. CP at 208. To that end, when meeting with contractors, such as Surface Solutions, Lavaring would tell contractors "where to go" and "what to do." CP at 201. And Lavaring oversaw all aspects of the 275 Degrees Project, including pouring concrete for the foundation, framing the townhomes, installing the electrical and plumbing systems, putting on the roofing, etc. Importantly, Lavaring inspected the jobsite regularly and possessed the authority to penalize contractors and its employees for failure to comply with safety regulations. To that end, Lavaring testified that he could remove the individual and contractor from the jobsite until they remedied the safety violation and provided a safety plan.

The evidence supports the Board's conclusion that Pulte retained a degree of control over the manner in which contractors at the 275 Degrees Project jobsite performed their work, and specifically how contractors performed safety practices.

Related to the Board's finding that Pulte exercised sufficient control over Surface Solutions, Pulte argues that the Board erroneously relied on *Weinert v. Bronco Nat'l Co.*, 58 Wn. App. 692, 795 P.2d 1167 (1990), a case abrogated by subsequent precedent. *Kamla*, 147 Wn.2d at

123-25; *Neil v. NWCC Inv. V, LLC*, 155 Wn. App. 119, 126-27, 229 P.3d 837 (2010); *Farias v. Port Blakely Co.*, 22 Wn. App. 2d 467, 481-84, 512 P.3d 574 (2022). In *Weinert*, an injured worker employed by a subcontractor brought an action against Bronco National Company (Bronco), the jobsite owner/developer. 58 Wn. App. at 693. Division One of this court held that Bronco was liable under WISHA. *Id.* at 696. The court in *Weinert* reasoned that even though Bronco was not a general contractor, an owner/developer was "so comparable to that of [a] general contractor" because it had "the same innate overall supervisory authority and [was] in the best position to enforce compliance with safety regulations," that our Supreme Court's holding in *Stute* applied. *Id.*

Since *Weinert*, several subsequent cases have cut against the court's holding in *Weinert*. *Kamla*, 147 Wn.2d at 123-25; *Neil*, 155 Wn. App. at 126-27; *Farias*, 22 Wn. App. 2d at 481-84. In *Kamla*, for example, our Supreme Court did not expressly overrule *Weinert*, but it made clear that jobsite owners were not "per se liable under the statutory requirements of RCW 49.17.060." 147 Wn.2d at 123. Moreover, the court explained that "jobsite owners [did not] play a role sufficiently analogous to general contractors to justify imposing upon them the same nondelegable duty to ensure WISHA compliance when there is no general contractor." *Id.* at 123-24. Deviating from *Weinert*'s holding, the court in *Kamla* held that a jobsite owner had only a duty under WISHA if it retained "control over the manner in which an independent contractor completes its work." *Id*. at 125. Subsequent cases have recognized that *Kamla*'s holding abrogated *Weinert*, so it is no longer good law. *Neil*, 155 Wn. App. at 126-27; *Farias*, 22 Wn. App. 2d at 481-84.

Contrary to Pulte's contention, the Board did not impermissibly rely on *Weinert*. While the Board acknowledged the history of *Stute* and subsequent cases like *Weinert*, the Board clearly articulated that "[u]nlike a general contractor under *Stute*, a landowner or developer is not

necessarily liable for safety violations on their jobsites, but they *may be liable if they retain control over the manner in which the work was performed*." CP at 14 (original emphasis omitted) (emphasis added). The Board articulated and applied the correct standard. *Compare* CP at 14 ("We hold that Pulte Homes, especially with regard to safety, retained and exercised control over safety planning, expectations, practices, and enforcement."), *with Kamla*, 147 Wn.2d at 125 (A "jobsite owner [has] a duty under WISHA" if it retains "control over the manner in which an independent contractor completes its work."). The Board also acknowledged *Farias*, a case recognizing that *Weinert* was abrogated by our Supreme Court in *Kamla*. Pulte's argument fails.

Next, Pulte relies on several cases holding that the jobsite owner and/or developer did not retain sufficient control to warrant liability under WISHA. *Neil*, 155 Wn. App. at 128; *Cano-Garcia*, 168 Wn. App. at 230-46; *Farias*, 22 Wn. App. 2d at 479-85; *Payne v. Weyerhaeuser Co.*, 30 Wn. App. 2d 696, 715, 546 P.3d 485 (2024); *Neice v. Pierce County Recycling, Composting & Disposal, LLC*, 32 Wn. App. 2d 807, 826-27, 557 P.3d 284 (2024), *review denied*, 4 Wn.3d 1019 (2025). These cases are unpersuasive for two reasons. First, none of these cases are in the same procedural posture as the case at bar where we are considering an administrative enforcement proceeding and therefore apply a highly deferential standard of review to the Department, the prevailing party at the Board. *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 271. In contrast, the cited cases contemplated tort actions dismissed under summary judgment. *Neil*, 155 Wn. App. at 122; *Cano-Garcia*, 168 Wn. App. at 229; *Farias*, 22 Wn. App. 2d at 487-99; *Payne*, 30 Wn. App. 2d at 710; *Neice*, 32 Wn. App. 2d at 817.

Second, unlike the cases Pulte cited, the terms of the MTCA enabled Pulte to impose any requirements on Surface Solutions in addition to WISHA regulations. *Compare* CP at 322 (under the MTCA, Surface Solutions was required to "fully comply (and . . . cause its employees and

17

Agents to comply) with any Project jobsite rules or regulations, including those that relate to safety, that Pulte may choose to put in place."), *with Neil*, 155 Wn. App. at 124; *Cano-Garcia*, 168 Wn. App. at 235-37; *Farias*, 22 Wn. App. 2d at 491-92; *Payne*, 30 Wn. App. 2d at 703-04; *Neice*, 32 Wn. App. 2d at 812-13.

In *Neil*, the contract at issue "did not contain any provisions regarding oversight of safety measures." 155 Wn. App. at 123. Likewise, in *Farias*, there was no discussion regarding contractual provisions allowing Port Blakely Company to impose additional safety measures or jobsite requirements on the independent contractor who employed the injured worker. 22 Wn. App. 2d at 491-92. Similarly, in *Neice*, there were no contract provisions that allowed Pierce County Recycling, Composting and Disposal, the jobsite owner, to control how the general contractor performed its work. 32 Wn. App. 2d at 812-14. In *Cano-Garcia*, the contract allowed King County to conduct inspections, "stop work for imminent hazards," and even require the independent contractor to provide "safety plans and programs." 168 Wn. App. at 236-37. The contract did not, however, enable King County to tell the independent contractor "how to perform its obligations under the contracts." *Id.* at 237.

The applicability of *Payne* is a closer call. In that case, the contract appears to have enabled Weyerhaeuser to impose additional *safety* requirements on the subcontractor. 30 Wn. App. 2d at 702-05.[3] Nevertheless, the case is still unpersuasive. This is so because here, the MTCA allowed Pulte to require Surface Solutions to comply "with any Project jobsite rules or regulations . . . that Pulte may choose to put in place." CP at 322. This provision in the MTCA was not limited to

---

[3] The facts in *Payne* go into detail about how Weyerhaeuser "required all of its contractors to comply with their confined space entry permit when they worked within confined spaces on the jobsite." 30 Wn. App. 2d at 704. It is unclear whether this was a requirement under WISHA and/or OSHA, or if this was an unrelated requirement imposed by Weyerhaeuser. *Id.* In either case, it was a safety requirement only.

safety, meaning that Pulte could impose a variety of rules or regulations that would affect how Surface Solutions performed its work.

As the Board recognized, Pulte, "especially with regard to safety, retained and exercised control over safety planning, expectations, practices, and enforcement." CP at 14. Even though there is nothing in the record demonstrating that Surface Solutions had to comply with additional requirements imposed by Pulte, Pulte had the contractual authority to do so under the terms of the MTCA. Again, the analysis does not turn on the "'the *actual interference* with the work of a subcontractor, but the *right* to exercise such control.'" *Payne*, 30 Wn. App. 2d at 713 (emphasis added) (quoting *Vargas*, 194 Wn.2d at 731).

Furthermore, a primary concern behind restricting liability for jobsite owners articulated in *Kamla* is not present here. 147 Wn.2d at 124-25. In a holding that suggests a case-by-case factual inquiry, our Supreme Court limited per se liability for jobsite owners based on the reality that not all entities possessed the same level of knowledge regarding WISHA. *Id*. In the court's words, "[j]obsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade." *Id.* at 124.

But here, the record illustrates that Pulte possessed a large degree of expertise and involvement when overseeing all aspects of the 275 Degrees Project. With respect to Surface Solutions, for example, Pulte had familiarity with applicable safety regulations, such as the ones at issue in this case pertaining to fall protection. Pulte is not lacking in knowledge and expertise like the jobsite owner in *Kamla*, and instead, along the spectrum of possibilities, is much more akin to a general contractor in knowledge and expertise. *See* 147 Wn.2d at 118, 125.

To counter this point, Pulte directs us to portions of the record that allegedly support that it did not retain sufficient control over Surface Solutions to be liable under WISHA. But "[w]e do not reweigh the evidence on appeal." *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 271. And even where there is "[t]he possibility of drawing inconsistent conclusions from the evidence," we can still find that the Board's findings were supported by substantial evidence. *Id.* at 271-72.

Additionally, Pulte argues that because Surface Solutions had contractual responsibility to abide by all safety regulations, Pulte could not be liable under WISHA. But because we conclude that substantial evidence supports the conclusion that Pulte retained sufficient control over the manner Surface Solutions performed its work, it is irrelevant whether Surface Solutions also had a duty to comply with all safety regulations. *See Vargas*, 194 Wn.2d at 739.

Therefore, we conclude that substantial evidence supports the Board's finding that Pulte retained sufficient control over the manner in which Surface Solutions performed its work. We recognize that we may have come to a different conclusion, but because the Board's findings and conclusions were supported by substantial evidence, we defer to its determination. Accordingly, the Board did not err in concluding Pulte owed a duty to maintain WISHA-compliant conditions at the jobsite.[4]

II.     SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S CONCLUSION THAT PULTE HAD CONSTRUCTIVE KNOWLEDGE OF SURFACE SOLUTIONS'S VIOLATIONS

Pulte argues that the Board's findings, specifically findings of fact 6 through 8, were erroneous and therefore do not support conclusions of law 4 and 5. We disagree.

---

[4] Pulte argues that the Board's finding that the penalty assessment was correctly calculated (finding of fact 9 and conclusion of law 6) is erroneous, reiterating that Pulte did not exercise sufficient control over Surface Solutions to be liable under WISHA. Because we conclude that Pulte did retain sufficient control over Surface Solutions to be liable as a jobsite owner under WISHA, we need not address their arguments on the Board's findings regarding the penalty assessment.

The Department bears the initial burden of proving a WISHA violation. WAC 263-12-115(2)(b); *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 272. WAC 296-880-20005(1) requires an employer to utilize fall protection when an employee is "on a walking/working surface with an unprotected side or edge four feet or more above the ground or lower level." To prove a serious violation of WISHA, the Department must establish:

> (1) the cited standard applies, (2) the requirements of the standard were not met, (3) employees were exposed to or had access to the violative condition, (4) *the employer knew or through the exercise of reasonable diligence could have known of the violative condition*, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.

*Ostrom Mushroom Farm*, 13 Wn. App. 2d at 272 (emphasis added). Here, Pulte only challenges the evidence supporting the fourth and fifth elements.

A.     Constructive Knowledge

The Department may prove employer knowledge with evidence of either actual or constructive knowledge; establishing the foreseeability of the violation is not required. *Pro-Active Home Builders, Inc. v. Dep't of Lab. & Indus.*, 7 Wn. App. 2d 10, 18, 465 P.3d 375 (2018); *Cent. Steel, Inc. v. Dep't of Lab. & Indust.*, 20 Wn. App. 2d 11 19, 498 P.3d 990 (2021). "In general, constructive knowledge is established where the employer in the 'exercise of reasonable diligence' could have become aware of the condition." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18 (quoting former RCW 49.17.180(6) (2018)).

"'Reasonable diligence' includes the obligation of an employer to inspect the worksite, anticipate hazards that employees may be exposed to, and take measures to prevent the occurrence of a violative condition." *Bayley Constr.*, 10 Wn. App. 2d at 783 (quoting *Erection Co. v. Dep't of Lab. & Indus.*, 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011)). "Constructive knowledge may be demonstrated by the Department in a number of ways, including evidence showing that the

violative condition was readily observable or in a conspicuous location in the area of the employer's crews." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18. The Department may also show constructive knowledge with evidence that a violation was in plain view of the public. *Potelco, Inc. v. Dep't of Lab. & Indus.*, 7 Wn. App. 2d 236, 244-46, 433 P.3d 513 (2018).

Here, viewing the facts in the light most favorable to the Department, substantial evidence supports that Pulte had constructive knowledge of Surface Solutions's violation because it occurred in plain view. The parties agree that it was Smith, not a bystander, who observed Ramirez on the deck without any fall protection, which conflicts with the Board's findings.

But this is ultimately inconsequential in deciding the issue. Ramirez was in plain view of Smith when walking around the 275 Degrees Project jobsite. Lavaring confirmed as much when testifying. CP at 214 ("[Y]ou could see from that photo, all [the Department] had to do was take a photo from the sidewalk and they could see that Mr. Ramirez was not wearing a fall harness."). And Ramirez was not working on the upper deck for a brief stint; he was working for approximately five hours without proper fall protection. Because the safety violation was readily apparent at the 275 Degrees Project jobsite, which was an open site, we conclude that Pulte had constructive notice of Surface Solutions's violation since it was in plain view.

B.      Risk of Serious Injury and Death

Next, Pulte argues that the Board's finding that the safety violations "created a substantial risk of serious bodily harm or death" is unsupported. Br. of Appellant at 20. Rather than challenging the substance of the Board's findings regarding this issue, Pulte relies on its prior argument that Surface Solutions, not Pulte, bore the responsibility of ensuring compliance with the cited safety regulations. Because we previously concluded that Pulte had a duty under WISHA as

a jobsite owner due to Pulte exercising sufficient control over Surface Solutions, this argument fails.

But even if Pulte were to challenge the merits of the Board's findings, substantial evidence supports that Ramirez was exposed to a hazard that had a substantial likelihood of death or serious injury. Smith testified that "falling 20 to 25 feet would [have] likely result[ed] in permanent disability or death." CP at 255. There was no other testimony suggesting otherwise.

Therefore, we conclude that substantial evidence supports the Board's findings that Pulte had constructive knowledge of Surface Solutions's violations. As a result, the Board's conclusion that the violations were properly classified as "serious" was not erroneous.

CONCLUSION

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Maxa, J.

Price, J.

23